UNITED SHOE MACHINERY COMPANY *vs*. EUCLID I. LA CHAPELLE.

Suffolk.   December 4, 1911. — July 1, 1912.

Present: RUGG, C. J., MORTON, HAMMOND, BRALEY, & SHELDON, JJ.

*Evidence.   Monopoly.   Equity Jurisdiction,* Specific performance.   *Restraint of Trade.   Interstate Commerce.*

Evidence that an inventor, at the time of making a contract in writing to enter the employ of a manufacturer and to assign to the manufacturer all inventions made by him, already had assigned an invention to the manufacturer and that this was the reason he executed the contract when told by the manufacturer's general manager to sign it, has no tendency to show that the inventor was not acting voluntarily when he made the contract.

In a suit against an inventor to enforce the specific performance of a provision in a contract to assign to the plaintiff all patents obtained by the defendant upon inventions made by him while in the employ of the plaintiff and for ten years thereafter, where the patent of which the plaintiff seeks the assignment was taken out by the defendant after the termination of such employment, evidence, tending to show that the inventions assigned to the plaintiff by the defendant during the term of his employment were worth as much as he had received in weekly wages under the contract, properly is excluded as immaterial.

The making by a corporation, engaged in the business of manufacturing and leasing patented machinery used in the manufacture of footwear throughout the United States, of leases of patented machines containing conditions that the lessees shall use in the manufacture of footwear no other machines which are not manufactured by the lessor, although resulting in a monopoly, is not an infraction of U. S. St. July 2, 1890, 26 U. S. Sts. at Large, c. 647.

Although the holder of letters patent lawfully may create an extended monopoly by imposing conditions on the use of the patent, a combination of patentees resulting in an extended monopoly is subject to the prohibitions contained in U. S. St. July 2, 1890, 26 U. S. Sts. at Large, c. 647.

A corporation, formed by the combination of seven or more corporations, each owning valuable patents for the making of machinery used in the manufacture of footwear, competing with each other in two thirds of the States of the Union and being all the principal shoe machinery manufacturers in the United States, which after its formation bought out competitors to at least the number of thirty and contracted with ninety-five per cent of the inventors of shoe machinery in the United States for the entire product of their inventive skill, whereby it controls from ninety to ninety-five per cent of all the shoe machinery in this country and has acquired a monopoly of inventions relating to shoe machinery, is an illegal combination in restraint of trade which has monopolized trade and commerce among the several States in violation of U. S. St. July 2, 1890, 26 U. S. Sts. at Large, c. 647.

In a suit in equity by a corporation, engaged in the business of manufacturing and

leasing patented machinery used in the manufacture of footwear throughout the United States, against an inventor, to enforce the specific performance of a provision in a contract in writing to assign to the plaintiff all patents obtained by the defendant upon inventions made by him while in the employ of the plaintiff and for ten years thereafter, the patent of which the plaintiff sought the assignment having been taken out by the defendant after the termination of such employment, where it was held that the plaintiff was formed and maintained by an illegal combination in restraint of interstate trade and commerce in violation of U. S. St. July 2, 1890, 26 U. S. Sts. at Large, c. 647, it appeared that an essential means by which the unlawful monopoly was maintained was the making by the plaintiff of contracts, like the one sought to be enforced, with ninety-five per cent of the inventors of shoe machinery in the United States. *Held*, that the contract sought to be enforced was an integral part of the unlawful scheme for monopolizing commerce among the several States, and would not be enforced by the court.

BILL IN EQUITY, filed in the Superior Court on April 22, 1910, for the specific performance of a provision of a contract in writing dated January 12, 1906. The material allegations of the bill are stated briefly in the opinion. It prayed that the defendant might be ordered to assign to the plaintiff a patent, which had been obtained by the defendant after the termination of his employment with the plaintiff, of an invention of the defendant of an improvement in "pulling over machines," which are used in the manufacture of shoes in pulling the upper over the last.

The contract containing the provision sought to be enforced was as follows:

"Know all men by these presents:

"That whereas Euclid I. La Chapelle, of Ashland, Massachusetts, has heretofore made certain inventions and improvements in machinery having to do with the manufacture of shoes and the said La Chappelle now desires to enter into the employment of the United Shoe Machinery Company, a corporation organized and existing under the laws of the State of New Jersey, having a place of business in Boston, Massachusetts (hereinafter referred to as the 'United Company'), or that the said United Company shall cause the said La Chapelle to be taken into the employment of one or more of the companies in the business of which by reason of its ownership of shares of the capital stock thereof or otherwise the United Company is interested (which said companies are hereinafter referred to as the 'associate, allied or subsidiary companies' of the said United Company) upon the terms and conditions hereinafter set forth;

"And whereas the United Company is willing to take the said La Chapelle into its employment or to cause the said La Chapelle to be taken into the employment of one or more of its associate, allied or subsidiary companies as aforesaid upon said terms and conditions.

"Now, therefore, this instrument witnesseth: That I, the said Euclid I. La Chapelle, in consideration of being taken into the employment of the said United Company or of any one or more of its associate, allied or subsidiary companies as aforesaid do hereby covenant and agree to and with the said United Company as hereinafter set forth:

"One.   I, the said La Chapelle, do hereby covenant and agree that so long as I shall be employed by the said United Company, its associate, allied or subsidiary companies, I will well and truly serve the said United Company and its associate, allied and subsidiary companies in such capacity and in the performance of such duties as may from time to time be assigned to me by the said United Company or by such person or persons as may be designated for such purpose by the said United Company and that I will give my entire time and the full and entire benefit of my skill, co-operation and endeavor to the accomplishment of the purposes and the performance of the duties of said employment so assigned to me and that I will at all times faithfully and truly and to the best of my skill and ability act diligently and loyally for the promotion of the interests of the said United Company, its associate, allied and subsidiary companies.

"Two.   I do hereby covenant and agree that all information concerning the business and affairs of the said United Company, or of any of its associate, allied or subsidiary companies, of which I shall at any time become possessed which is of a confidential or private nature I will carefully guard and keep and that I will at no time, either while I am in the employment of the United Company or its associate, allied or subsidiary companies, or after such employment shall have ceased, disclose any such information to any other person or employ the same in anywise other than for the benefit of the United Company, its associate, allied or subsidiary companies, in connection with my said employment.

"Three.   I do hereby sell, assign, transfer and set over unto the said United Company any and all inventions, improvements,

Letters Patent and applications for Letters Patent (both of the United States and of any and all other countries) and any and all rights or interests in, to or under inventions, improvements, Letters Patent and applications for Letters Patent heretofore made by me or now had by me or which I have any right by agreement or otherwise to acquire or take over, and any and all inventions and improvements which I may at any time hereafter during the continuance of my employment by the United Company or by any one or more of its associate, allied or subsidiary companies, or at any time within ten (10) years from the termination of any such employment, make either as sole inventor or as joint inventor with others and whether made in or out of the usual working hours or upon the premises of the United Company, its associate, allied or subsidiary companies, or elsewhere, and all inventions, improvements, Letters Patent and applications for Letters Patent (both of the United States and of any and all other countries), and all right, title and interest in, to or under inventions, improvements, Letters Patent and application for Letters Patent (both of the United States and of any and all foreign countries) which I may at any time during the continuance of my said employment by the United Company, or by one or more of its associate, allied or subsidiary companies, or at any time within said period of ten (10) years from the termination of any such employment in anywise acquire, own or control or have any right by agreement or otherwise to acquire or take over relating or pertaining in any way to footwear or to machinery, tools, mechanisms, devices, materials, supplies, processes or things intended or adapted for use in the manufacture thereof; and I do hereby covenant and agree to and with the said United Company that I will forthwith disclose to the United Company, its officers and patent solicitors, all inventions, improvements, Letters Patent, interests and rights heretofore made or now had by me and herein conveyed or provided to be conveyed and that upon making any such invention or improvement or acquiring any right, title or interest in, to or under or any right to acquire or take over any invention or improvement, Letters Patent or application for Letters Patent herein conveyed or provided to be conveyed I will forthwith disclose the same to the United Company, its officers and patent solicitors; will repeat such disclosures when and as often as requested by the United

Company; and that I will and my heirs, executors and adminis-
trators shall at any and all times thereafter upon the request of
the United Company, execute and cause to be executed any and
all applications for Letters Patent, assignments and other papers
in such form as shall be approved by counsel for the United Com-
pany, and will perform and cause to be performed any and all
acts which may be necessary or desired by the said United Company
to obtain to the said United Company, its successors, assigns or
nominees, Letters Patent of the United States and of any and all
other countries where it may be desired to obtain Letters Patent
covering such inventions and improvements, or any of them, and
to fully and completely vest and confirm in the said United Com-
pany, its successors and assigns, or in the nominee or nominees
of the said United Company, the full and complete right, title and
interest in, to and under all such inventions, improvements, Letters
Patent, applications for Letters Patent, interests and rights, and
to enable the said United Company, its successors, assigns or nom-
inees, to secure and enjoy the full benefits and advantages thereof.

"Four.  I, the said La Chapelle, do hereby further covenant and
agree to and with the said United Company that I will not (without
the consent in writing of the United Company first obtained) at
any time during the continuance of my said employment by the
United Company or by any one or more of its associate, allied or
subsidiary company [companies], or at any time within ten (10)
years from the termination of any such employment, in any
country, either directly or indirectly, individually or in combination
with others, as officer or stockholder of a corporation, or as man-
ager, agent or employee, or otherwise (excepting as an employee
of the said United Company, its associate, allied or subsidiary com-
panies) enter into or be engaged or interested in or financially or
otherwise assist any person, firm or corporation in entering into,
developing or carrying on any business which consists in whole
or in part of or relates or pertains in any way to manufacturing
or dealing in machinery, tools, mechanisms, devices, materials,
supplies, processes or things relating or pertaining in any way to
boots or shoes or to the manufacture thereof, or in making, de-
veloping or exploiting any invention pertaining to such machinery,
tools, mechanisms, devices, materials, supplies, processes or things,
or in any business which will in any way compete or interfere

with the business of the United Company, or of any of the associate, allied or subsidiary companies of the United Company.

"Five. It is understood and agreed that the employment herein referred to of the said La Chapelle by the said United Company, its associate, allied or subsidiary companies, shall continue so long only as shall be mutually desired by the said United Company and by the said La Chapelle and that the United Company shall pay or shall cause to be paid to the said La Chapelle during the continuance of such employment compensation at the rate of not less than twenty dollars ($20) per week.

"Six. The term 'United Company' as herein used shall be held to include the said United Shoe Machinery Company and its successors and assigns, and all covenants and agreements on the part of the said La Chapelle herein contained may be enforced by and for the benefit of the United Company, or by any one or more of its associate, allied or subsidiary companies.

"In witness whereof I, the said Euclid I. La Chapelle, have hereunto set my hand and seal this twelfth day of January, 1906.

Euclid I. La Chapelle   (seal) "

The sixth paragraph of the defendant's answer was as follows:

"6. The complainant is a corporation and in the year 1899 it was constituted by a combination of all the principal shoe machinery manufacturers in the United States of America, and organized as a corporation under its present name, and by said combination it acquired control in the several states of the United States of America, of the business of manufacturing, leasing and selling throughout the United States of America of shoe machinery for manufacture of footwear and acquired the greater part of the valuable inventions which had been made prior to 1899 in shoe machinery; that by such combination of manufacturers into the complainant corporation, the complainant acquired such control of the business of making, leasing and selling shoe machinery that ever since 1899 ninety per cent of the shoe machinery in use in the United States has been that made and leased or sold by the complainant, and the complainant has kept and continued its monopoly by refusing to sell the basic and principal machines made by it for use in manufacturing footwear, and has leased the same only, to manufacturers, selling only auxiliary and unimpor-

tant machines, and then coupled with the requirement that materials used shall be purchased only from the complainant; and, as a further means of maintaining its said monopoly the said complainant has inserted in its leases of the principal or basic machines a requirement that the lessee shall use only its, the complainant's, machinery in the manufacture of shoes, and a further provision that in case of non-performance by the lessee of such agreement the complainant may remove its machines from the lessee's factory; that it also ever since 1899 has inserted, and now inserts in such leases, with intent to continue its monopoly, a further provision that without any cause whatsoever it may abrogate the lease at any time upon thirty days' notice, and the complainant controls ninety per cent of the shoe machinery in use in the United States, and shoe manufacturers can procure no machinery elsewhere to supply all their needs and they are obliged to use only the machinery supplied by the complainant; and the complainant for ten years last past has created and during all that time maintained and now maintains a monopoly of patents relating to machinery and appliances used in the manufacture of footwear in the United States of America by contracting with a very great number of inventors of shoe machinery and appliances for making footwear, for the entire product of their inventive faculties in that line, and the said complainant, in furtherance of and as a means to that end, and an important means to maintaining its monopoly, has made during said ten years last past and is now making with a great many such inventors, contracts like that annexed to the complainant's bill, and by means of such contracts and of its monopoly of shoe machinery in use in the United States, and the requirements contained in its leases of machinery to manufacturers the complainant has for more than ten years last past monopolized and does now monopolize trade and commerce between the States and territories of the United States of America in the making, leasing and sale of shoe and footwear machinery, and does now have a monopoly thereof, and an inventor in line of shoe machinery cannot introduce by reason of the facts hereinbefore stated any new shoe machinery with manufacturers of footwear in the United States, nor can he sell his invention to any other than the complainant, and no patent relating to shoe machinery and not owned by the complainant can be used in the United States of America, all

of which the respondent says is in violation of the Act of Congress of the United States of America passed July 2, 1890 and published in 26 U. S. Statutes at Large, Chapter 647, entitled: 'An Act to protect trade and commerce against unlawful restraints and monopolies'; and the respondent says that the contract between him and the said United Shoe Machinery Company set forth in the plaintiff's bill is a contract made in aid of restraining trade among the several States in leasing and selling shoe machinery and in carrying on the business of manufacturing it, and is in restraint of commerce between said several States under the first section of said Act of July 2, 1890, and that the said United Shoe Machinery Company by reason of said contract and of contracts such as that set forth in its bill and of its acts hereinbefore in this paragraph set forth is monopolizing trade and commerce between the several states of the United States of America in the business of manufacturing, leasing and selling shoe machinery therein, and has done so ever since 1899, and that the contract set forth in the plaintiff's bill is unlawful under the first, second, third and eighth sections of the said Act of Congress of July 2, 1890." The sections here were quoted.

In the Superior Court the case was tried before *Hardy*, J. The defendant testified that in November, 1905, he made an oral agreement with the general manager of the plaintiff to go to work for the plaintiff as an inventor of shoe machinery and then assigned to the plaintiff an invention in shoe machinery which he previously had made, and that it was at that time agreed between the general manager of the plaintiff and the defendant that a contract should be drawn up between the plaintiff and the defendant to contain the terms of an agreement then orally made by them. Upon the date of the signing of the contract the defendant went to the place of business of the plaintiff and saw the general manager of the plaintiff, and a typewritten contract was produced, which was the contract sought to be enforced. The defendant testified that he objected to the language of it, as being contrary to the oral agreement for the reason that it did not provide for the payment to the defendant of any sum other than "not less than $20 per week" as remuneration. The defendant testified that the general manager said to him "sign it" and that he objected. The following question then was put to the defendant:

"At the time that you signed the contract, state whether or not the fact that you had already assigned the invention to the company had any effect in causing you to sign the contract?" Upon objection by the plaintiff the judge said: "If he said anything about it to Mr. Wilson, I will hear what was said on the subject, but his feeling or mental conclusion about it, I do not think have any weight." The counsel for the defendant said that he offered the evidence for the purpose of showing the reason for signing the contract; that the defendant was intimidated in that way in an equitable sense. The judge excluded the evidence, and the defendant excepted. Later in the course of the trial the defendant was asked: "Whether or not you should have signed that contract if you had not assigned that invention to the company?" Upon objection the judge excluded the question, and the defendant excepted.

The defendant offered evidence which tended to show that inventions which he made and assigned to the plaintiff while he was employed by it were worth as much as the defendant had received in remuneration under the contract. The judge excluded the evidence, and the defendant excepted.

Before the defendant produced any evidence in support of the answer, the plaintiff asked the judge to rule that the allegations contained in the sixth paragraph of the answer set forth no defense to the plaintiff's bill and that no evidence was admissible thereunder.

The counsel for the defendant stated that he desired to make an offer of proof under the sixth clause of the answer, and the judge suggested that the counsel should make the offer of proof at that time as to what he intended to offer under the sixth paragraph. The defendant thereupon offered to introduce evidence to establish the following facts:

That seven or more corporations manufacturing, selling and leasing ninety per cent of the shoe machinery in use in the several States of the United States in 1899, and which were competing in 1899 with one another in two thirds of the States in the United States in the manufacturing, selling and leasing of shoe machinery were merged into the plaintiff corporation in the year 1899; that this merger was brought about in order to prevent competition among the several companies; that ever since the merger in 1899 the plaintiff has manufactured, leased and sold ninety-five per

cent of the shoe machinery in use in the United States and has so engaged in business in every State in the United States and in foreign countries; that the plaintiff shortly after that time, since the merger in 1899, has been buying up, and has bought up, competing corporations and persons, the number of which is at least thirty, and this for the purpose of diminishing competition; that ever since the merger the plaintiff has used leases of a form which was offered in evidence; that the plaintiff has ever since the merger in 1899 in many cases sold or leased shoe machinery at less than cost, without profit, to displace competing machinery; that the plaintiff has in at least one instance hired a workman from a competitor since 1899 with the intent to break up such competitor's business; that it has in some instances removed machinery leased to shoe manufacturers because they used competing machines, and this under the provision authorizing this action in the lease; that in one case since the merger it has procured the discharge of a factory foreman because he favored competing machinery; that the plaintiff has employed to stifle competition contracts in most cases similar in form to the one on which specific performance is sought in this case with ninety-five per cent of the inventors of shoe machinery in the United States, all with the purpose of stifling competition and restraining trade and commerce between the States; that it has undertaken to stifle competition by means of its leases, by monopolizing inventors and by maintaining a monopoly of patents relating to shoe machinery so that the plaintiff now controls ninety per cent or ninety-five per cent of the shoe machinery in the United States, and that the plaintiff has acquired by the means set forth in the offer a monopoly of inventions relating to shoe machinery.

Thereupon the judge made the ruling requested by the plaintiff and excluded the evidence offered by the defendant. The defendant excepted.

The judge found that the allegations of the bill were sustained, and ordered that a decree should be entered for the plaintiff in accordance with the prayers of the bill. The defendant alleged exceptions.

*G. W. Anderson,* for the defendant.

*W. B. Farr,* (*N. B. Todd* with him,) for the plaintiff.

RUGG, C. J.    This is a suit in equity by which specific perform-

ance of a contract between the plaintiff and the defendant is sought. The plaintiff is a manufacturer, and the defendant an inventor, of shoe machinery. The contract provided, among other matters, for the employment by the plaintiff of the defendant in designing and improving shoe machinery, terminable at the will of either party, with wages at the rate of $20 a week. One paragraph of the contract bound the defendant to assign to the plaintiff any and all inventions, improvements and patents which he should make during the continuance of the contract and for ten years thereafter, and for a like period not to engage in any similar business. The employment under the contract continued from 1906, with a brief interruption, until 1909, when it ceased. Since then the defendant has taken out a patent for some improvement in shoe machinery which he refuses to assign to the plaintiff, and this suit is to compel such assignment.

The cause comes up on exceptions, and hence only limited and narrow questions are presented. The broader issues which would be open on an appeal are not raised. Whether the contract is unconscionable and hence unenforceable, although somewhat argued, falls in this class and is left undecided by this judgment. The point is not made that the plaintiff or its conduct constitutes a monopoly or an engrossing at common law, in furtherance of which the contract in suit was made, and hence that question is left on one side.

1. The defendant offered to show that before the contract was made he had assigned to the plaintiff an invention, and that although he said nothing about it he was by reason of this fact "intimidated . . . in an equitable sense" when the general manager of the plaintiff presenting the contract told him to "sign it." There is nothing to indicate duress, or that the defendant was not a free agent when he made the contract and during the three years of work under it. Whatever may be said as to the illusory character of freedom of contract growing out of economic conditions (*Continental Wall Paper Co.* v. *Voight & Sons Co.* 212 U. S. 227, 271), the defendant utterly fails to show that he acted under any element of duress, in its legal sense, or that he suffered any injury by the exclusion of this proffered evidence. *Connolly* v. *Bouck*, 98 C. C. A. 184; 174 Fed. Rep. 312. *Silliman* v. *United States*, 101 U. S. 465.

2. It was of no consequence whether the inventions assigned by

the defendant to the plaintiff during the term of his employment were equivalent in value to his wages. It was an implied condition of his contract that he should do his best. The value of his work to the plaintiff had no bearing upon any issue raised.

3. There are averments that the plaintiff is a monopoly perpetuated by means of conditions in leases of certain patented machines to the effect that the lessees shall use no other machines not manufactured by the plaintiff, and that the plaintiff thus secures to itself a monopoly of all machinery used in the manufacture of footwear which is alleged to be an infraction of the federal anti-trust act of July 2, 1890, 26 U. S. Sts. at Large, c. 647. The power to make such leases appears to be within the protection granted by the patents. This is settled by *Henry* v. *A. B. Dick Co.* 224 U. S. 1, decided since the argument of this case. See also *National Phonograph Co. of Australia* v. *Menck,* [1911] A. C. 336; *United Shoe Machinery Co. of Canada* v. *Brunet,* [1909] A. C. 330, 344. Hence these allegations and the evidence offered in support of them drop out of the case.

4. The remaining material matters averred in the answer of the defendant as to alleged violation of the federal anti-trust act are in substance that in 1899 the plaintiff was constituted by the combination of seven or more pre-existing corporations competing with each other in two thirds of the States of the Union, being all the principal shoe machinery manufacturers in the United States, and that by their merger into the single organization of the plaintiff, it acquired monopolistic control of the business of manufacturing, leasing and selling throughout the United States shoe machinery for the manufacture of footwear, and that it obtained the greater part of the valuable inventions of such machinery made before 1899, and that since 1899 it has bought competing corporations to the number of at least thirty for the purpose of diminishing competition, and thus has gained control of ninety per cent of the shoe machinery business; that it has achieved and maintained its monopoly of manufacture and trade and commerce in this class of manufactures between the several States of the Union by contracting with ninety-five per cent of the inventors of shoe machinery for the entire product of their inventive skill, through contracts similar in form to that with the defendant; and that by these means it has stifled competition, so that it now controls from

ninety to ninety-five per cent of all the shoe machinery in the United States, and has acquired also a monopoly of inventions relating to shoe machinery, and that the contract in suit was made in furtherance of that monopoly, all in violation of 26 U. S. Sts. at Large, c. 647. The court below ruled that no evidence was admissible under this averment of the answer, and excluded all evidence offered. The defendant's exceptions to this ruling present the principal question in the case.

This main inquiry divides itself into two parts: First, whether the plaintiff is itself an illegal combination in restraint of trade and has monopolized trade and commerce between the several States, and second, whether the contract sought to be enforced is a contract in direct aid of such monopoly. Both these subsidiary questions ultimately must be governed by decisions of the Supreme Court of the United States, for they relate to interstate commerce and the meaning of a federal statute touching that subject. No such decision has been made exactly covering the points presented, but as they are raised it becomes necessary to decide them.

It is to be observed that the averment of the answer is positive and direct that the plaintiff has acquired and maintained a monopoly of interstate trade in shoe machinery, and the offer of proof in this regard was co-extensive with the averment. This brings the case within the words of § 2 of the anti-trust act, which subjects to a penalty "Every person who shall monopolize . . . any part of the trade or commerce among the several States." This section is complementary of § 1 of the same act, which prohibits all contracts and combinations to the end of monopolizing trade and commerce. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 59–62. That decision, as we understand it, holds that the test to determine whether or not a given contract or combination is in restraint of interstate trade and commerce is the standard of reason as applied to like contracts or combinations at common law. We are not called upon to apply that rule because this record presents as its hypothesis an existing and absolute monopoly of a branch of interstate commerce founded upon a combination. When an actual monopoly is established in the sense in which that term was used in the law when the statute was enacted, then contract must be closely scrutinized to determine whether it is in furtherance thereof or unreasonable and a violation of the statute.

The earlier conception of a monopoly was a grant of an exclusive right from the sovereign power. This still defines with accuracy that which an inventor receives under the patent laws. But in a wider sense monopoly denotes a combination, organization or entity so extensive, exclusive and unified, that its tendency is to prevent competition in its comprehensive sense with the consequent power to control prices to the public harm. *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115, 129. *United States* v. *American Tobacco Co.* 221 U. S. 106. *United States* v. *St. Louis Terminal,* 224 U. S. 383. *United Shoe Machinery Co. of Canada* v. *Brunet,* [1909] A. C. 330. See cases collected in Cooke on Combinations, § 116. But whatever may be the precise definition of the word monopoly as used in this statute, a business device by which a considerable number of competing corporations are welded into a single corporate entity which controls from ninety to ninety-five per cent of the commerce of the country in a particular branch required for the economical production of a necessity of mankind, is a monopoly. See *Dr. Miles Medical Co.* v. *Park & Sons Co.* 220 U. S. 373, 408; *United States* v. *Standard Sanitary Manuf. Co.* 191 Fed. Rep. 172. The modern machinery for the manufacture of footwear would seem to be a close approach to a prime necessity. See *Central Shade Roller Co.* v. *Cushman,* 143 Mass. 353, 364; *Gloucester Isinglass & Glue Co.* v. *Russia Cement Co.* 154 Mass. 92, 94; *Gamewell Fire Alarm Telegraph Co.* v. *Crane,* 160 Mass. 50; Taft, J., in *United States* v. *Addyston Pipe & Steel Co.* 29 C. C. A. 141; 85 Fed. Rep. 271, 286.

It is fairly inferable from the averments of the answer and the offer of proof that the constituent competing companies out of which the plaintiff was formed each owned valuable patents for machines used in the making of footwear. Therefore the further question arises whether a combination among several patentees of competing devices is within the inhibition of the statute. There is no decision by the United States Supreme Court covering this point, although there is an intimation in *Bement* v. *National Harrow Co.* 186 U. S. 70, 94, 95, to the effect that such a combination may be illegal under certain circumstances. The holder of a patent is given an absolute monopoly of the invention covered thereby, not affected in any degree by the Sherman anti-trust act. He may refuse to use it, or may use it in part only, or grant

its use to others upon conditions, and he may prevent all others from infringing in any way upon the rights thus secured to him. *Continental Paper Bag Co.* v. *Eastern Paper Bag Co.* 210 U. S. 405. But he is given no immunity from general laws governing the rest of the community and not directly affecting his patent rights. He holds the thing patented subject to general police regulations. There is nothing inherent in his patent or in the nature of his peculiar privileges, which enables him to be free from general laws enacted for the common good. This is plain respecting articles dangerous to life, health or safety. *Patterson* v. *Kentucky*, 97 U. S. 501. *Webber* v. *Virginia*, 103 U. S. 344, 348. *Allen* v. *Riley*, 203 U. S. 347. The recent decision of *Henry* v. *A. B. Dick Co.* 224 U. S. 1, has emphasized the principle that a patentee may annex such conditions as he chooses to the use of the invention. It is the purpose of the patent laws to encourage the exercise of inventive genius by securing to the inventor for a limited period the exclusive control of his discovery. This is a distinct monopoly. The Dick case holds, though by a divided court, that conditions which are directed to the building up of other business than that protected by the patent may stand under its sheltering monopoly. But no question of combination under the Sherman anti-trust act was involved in that case.

It is urged by the plaintiff in substance that this aspect of the case is concluded in its favor by *Bement* v. *National Harrow Co.* 186 U. S. 70. But we do not so understand that judgment. That was an action to recover liquidated damages for breach of several contracts in relation to the manufacture and sale of patented implements. There was no finding by the referee, on whose report the decision was founded, that the plaintiff had become an illegal monopoly by reason of a combination of different persons owning distinct patents. Whatever allegations in the answer looked in that direction were not supported by the finding of the referee. In its last analysis it relates to conditions attached to the sale of patented articles. The extent of this decision is, as stated at page 91 and quoted with approval in 224 U. S. 30: "The very object of these [patent] laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use

or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal." See *National Phonograph Co. of Australia* v. *Menck,* [1911] A. C. 336. The case at bar in this aspect does not deal with conditions annexed to the use of inventions protected by letters patent. It goes a step further and touches a more fundamental consideration. A combination of persons, competing in the market under sundry patents, for the purpose of ending the competition and acquiring thereby complete mastery of a branch of interstate commerce is the gravamen of the defense. *Bement* v. *National Harrow Co.* 186 U. S. 70, and *Henry* v. *A. B. Dick Co.* 224 U. S. 1, do not affect this question. The monopoly protected by the patent goes no further than the invention and contractual obligations attached to it. It does not protect other commercial ventures attempted by the owner, even though indirectly or remotely they may relate to the invention. It may be said that inasmuch as the patentee may annex any condition to the sale of his invention, he may subject the user of it to a series of obligations as to other kindred or disconnected articles so extended in number and so comprehensive in scope as to gain an absolute monopoly the size of which would be measured only by the necessity or taste of mankind in the use of particular inventions and the commercial power of the holder of the patent. Whatever else may be said of such a monopoly, it nevertheless would be true that it would be built on the patent and not on a combination. The basic charge against the present plaintiff is the manner and means by which its monopoly has been established, namely, the combination. Conditions and combinations are different in kind. They are distinctly separate commercial agencies. They are distinguishable not in degree but in substance. Conditions annexed by the patentee to the enjoyment of an invention are legal even though resulting in an extended monopoly. Combinations among patentees resulting in an extended monopoly are illegal.

Protection by patent is established by Congress. It is not a constitutional guaranty, but depends wholly on the statutes. An act of Congress directed against evils which were assumed to arise from the monopolistic combination of those engaged in interstate commerce comes from the same source and carries the same obligation of enforcement as do the patent laws. No word or

phrase in the Sherman anti-trust act reveals an intent to exempt the owners of patents from its sweeping provisions against monopolistic combination. We are unable to perceive any underlying reason for supposing that by implication growing out of economic or business conditions such an exemption was intended. There appears to be no inherent natural distinction between owners of patents and owners of oil which would justify the application of the statute to one and not to the other. The conclusion seems to follow that the comprehensive condemnation of the act against every person who monopolizes interstate commerce by combination with others includes holders of patents as well as others.

The great weight of authority supports this view, although there are decisions to the contrary.* It appearing by the allegations of the answer and the evidence offered under them that the plaintiff exercises a monopoly of the interstate trade, which is not protected against the provisions of the Sherman anti-trust act by the federal patent laws, it is not necessary to pursue further the inquiry as to its unlawful character. See *United States* v. *Winslow*, 195 Fed. Rep. 578; *Strout* v. *United Shoe Machinery Co.* 195 Fed. Rep. 313.

It remains to determine whether the contract, the specific performance of which is sought, is in direct aid of the illegal combination amounting to monopoly of trade or commerce among the several States, contrary to the federal statute. Of course not

---

* *National Harrow Co.* v. *Quick*, 67 Fed. Rep. 130. *National Harrow Co.* v. *Hench*, 76 Fed. Rep. 667; *S. C.* 27 C. C. A. 349; 83 Fed. Rep. 36. *National Harrow Co.* v. *Hench*, 84 Fed. Rep. 226. *United States* v. *Addyston Pipe & Steel Co.* 29 C. C. A. 141, 160; 85 Fed. Rep. 271, 291. *Bobbs-Merrill Co.* v. *Straus*, 139 Fed. Rep. 155. *Indiana Manuf. Co.* v. *J. I. Case Threshing Machine Co.* 148 Fed. Rep. 21, 28. *Blount Manuf. Co.* v. *Yale & Towne Manuf. Co.* 166 Fed. Rep. 555. *Pacific Factor Co.* v. *Adler*, 90 Cal. 110. *Vulcan Powder Co.* v. *Hercules Powder Co.* 96 Cal. 510. *Craft* v. *McConoughy*, 79 Ill. 346. *Gamewell Fire Alarm Telegraph Co.* v. *Crane*, 160 Mass. 50. See *Richardson* v. *Buhl*, 77 Mich. 632, 638; *Detroit Salt Co.* v. *National Salt Co.* 134 Mich. 103; *Arnot* v. *Pittston & Elmira Coal Co.* 68 N. Y. 558; *Cummings* v. *Union Blue Stone Co.* 164 N. Y. 401; *Cohen* v. *Berlin & Jones Envelope Co.* 166 N. Y. 292, 299.

*Contra:* *United States Consolidated Seeded Raisin Co.* v. *Griffin & Skelley Co.* 61 C. C. A. 334; 126 Fed. Rep. 364. *Rubber Tire Wheel Co.* v. *Milwaukee Rubber Works Co.* 83 C. C. A. 336; 154 Fed. Rep. 358. *Indiana Manuf. Co.* v. *J. I. Case Threshing Machine Co.* 83 C. C. A. 343; 154 Fed. Rep. 365. See *Davis* v. *A. Booth & Co.* 65 C. C. A. 269; 131 Fed. Rep. 31, 37; *Trenton Potteries Co.* v. *Oliphant*, 13 Dick. 507, 524.

every contract of an illegal monopoly is void. Such a monopoly is not an outlaw. The principle established touching monopolies conducting interstate commerce in contravention of the Sherman anti-trust act is that their contracts which do not have a direct and immediate effect upon interstate commerce are binding and enforceable. *United States* v. *E. C. Knight Co.* 156 U. S. 1, 17. *United States* v.· *Joint Traffic Association,* 171 U. S. 505, 568. *Anderson* v. *United States,* 171 U. S. 604, 615. *Connolly* v. *Union Sewer Pipe Co.* 184 U. S. 540. *Diamond Glue Co.* v. *United States Glue Co.* 187 U. S. 611, 616. *Montague* v. *Lowry,* 193 U. S. 38, 48. *Field* v. *Barber Asphalt Paving Co.* 194 U. S. 618, 623. *Engel* v. *O'Malley,* 219 U. S. 128, 139. See *Union Pacific Coal Co.* v. *United States,* 97 C. C. A. 578; 173 Fed. Rep. 737; *Whitwell* v. *Continental Tobacco Co.* 60 C. C. A. 290, 296; 125 Fed. Rep. 454; *Arkansas Brokerage Co.* v. *Dunn & Powell,* 97 C. C. A. 454; 173 Fed. Rep. 899; *Virtue* v. *Creamery Package Manuf. Co.* 102 C. C. A. 413; 179 Fed. Rep. 115. It was said in *Hopkins* v. *United States,* 171 U. S. 578, at 592, respecting contracts alleged to be in aid of an unlawful monopoly of interstate trade and commerce: "There must be some direct and immediate effect upon interstate commerce in order to come within the act. . . . Many agreements suggest themselves which relate only to facilities furnished commerce, or else touch it only in an indirect way, while possibly enhancing the cost of transacting the business, and which at the same time we would not think of as agreements in restraint of interstate trade or commerce. They are agreements which in their effect operate in furtherance and in aid of commerce by providing for it facilities, conveniences, privileges or services, but which do not directly relate to charges for its transportation, nor to any other form of interstate commerce. To hold all such agreements void would in our judgment improperly extend the act to matters which are not of an interstate commercial nature."

The contract which incidentally, collaterally or remotely affects interstate commerce, although indirectly in furtherance of and advantageous to interstate commerce, is not within the scope of the act. It must appear that the effect of such a contract is direct and substantial. The contract between the plaintiff and the defendant did not relate primarily to interstate commerce. It was for labor and skill alone. It had nothing to do with the transportation of

goods.  But taking the averments of the answer and the proffered. evidence to be true, as we are bound to do on this record, it was made by one who had a monopoly of one branch of trade; it was one of many similar contracts with individuals enough to constitute a practical monopoly of skill in that department; it was a necessary link in a chain of contracts essential to the maintenance and preservation of monopoly in interstate trade which had been established by the plaintiff.

Such a case is within the principle announced in *Continental Wall Paper Co.* v. *Voight & Sons Co.* 212 U. S. 227, 261, that the plaintiff comes into a court of equity for aid in enforcing a contract which according to the allegation and offer of proof was intended to be and was in fact an essential part of an illegal scheme.  The words of the court in *Swift & Co.* v. *United States*, 196 U. S. 375, at 396, are applicable: "The scheme as a whole seems to us to be within reach of the law.  The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it.  Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme.  It is suggested that the several acts charged are lawful and that intent can make no difference.  But they are bound together as the parts of a single plan.  The plan may make the parts unlawful.  *Aikens* v. *Wisconsin*, 195 U. S. 194, 206."  The provision of the contract here sought to be enforced that for ten years after its termination every invention shall be assigned to the plaintiff savors of restraint of trade.  It projects itself so far beyond the period of actual employment and payment of wages that it appears plainly to be in aid of the unlawful combination.  It would choke the inventive capacity of the defendant for a period so long after his employment ceased that his usefulness to himself or to any competitor would be extinguished in most instances.  When this contract is multiplied by substantially all like inventors in the country, its character as aiding the combination is too clear to require further discussion.  A single contract for the employment in labor of one person is far away from interstate commerce.  But when it is alleged that it is one among others with ninety-five per cent of all those skilled in a particular manufacture, and that that kind of manufacture is controlled by a combination formed of many pre-

viously competing persons which monopolizes all or substantially all interstate commerce of that kind, the single contract for labor loses its individual aspect in the larger relation it bears to the monopoly in interstate commerce. As a single incident it may be harmless. As an integral part of an unlawful scheme for monopolizing commerce between the States which cannot be perpetuated successfully without contracts of similar tenor with all practising a like craft, it partakes of the illegality of the scheme.

*Exceptions sustained.*