## TRANSPARENT-WRAP MACHINE CORP. *v.* STOKES & SMITH CO.

No. 208.  Argued January 7, 8, 1947.—Decided February 3, 1947.

*R. Morton Adams* argued the cause and filed a brief for petitioner.

*Samuel E. Darby, Jr.* argued the cause for respondent. With him on the brief was *Virgil E. Woodcock.*

*Acting Solicitor General Washington, Assistant Attorney General Sonnett* and *Paul A. Sweeney* filed a brief for the United States, as *amicus curiae,* in support of respondent.

638

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit for a declaratory judgment (Judicial Code § 274d, 28 U. S. C. § 400) and an injunction, instituted by respondent for the determination of the legality and enforceability of a provision of a patent license agreement. The District Court, whose jurisdiction was based on diversity of citizenship (Judicial Code § 24 (1), 28 U. S. C. § 41 (1)), entered judgment for petitioner, holding the provision valid. The Circuit Court of Appeals reversed by a divided vote, 156 F. 2d 198, being of the opinion that the provision in question was illegal under the line of decisions represented by *Mercoid Corporation* v. *Mid-Continent Co.,* 320 U. S. 661. The case is here on a petition for a writ of certiorari which we granted because of the public importance of the question presented and of the apparent conflict between the decision below and *Allbright-Nell Co.* v. *Stanley Hiller Co.,* 72 F. 2d 392, decided by the Seventh Circuit Court of Appeals.

Petitioner, organized in 1934, has patents on a machine which bears the trade-mark "Transwrap." This machine makes transparent packages, simultaneously fills them with such articles as candy, and seals them. In 1937 petitioner sold and respondent acquired the Transwrap business in the United States, Canada, and Mexico, the right to use the trade-mark "Transwrap," and an exclusive license to manufacture and sell the Transwrap machine under the patents petitioner then owned or might acquire. The agreement contained a formula by which royalties were to be computed and paid. The term of the agreement was ten years with an option in respondent to renew it thereafter for five-year periods during the life of the patents covered by the agreement. The agreement could be terminated by petitioner on notice for specified defaults on respondent's part. The provision of

the agreement around which the present controversy turns is a covenant by respondent to assign to petitioner improvement patents applicable to the machine and suitable for use in connection with it.[1]

The parties had operated under the agreement for several years when petitioner ascertained that respondent had taken out certain patents on improvements in the machine. Petitioner notified respondent that its failure to disclose and assign these improvements constituted a breach of the agreement and called on respondent to

---

[1] The relevant portions of this provision read as follows:

"If the Licensee shall discover or invent an improvement which is applicable to the Transwrap Packaging Machine and suitable for use in connection therewith and applicable to the making and closing of the package, but not to the filling nor to the contents of the package, it shall submit the same to the Licensor, which may, at its option, apply for Letters Patent covering the same. In the event of the failure of the Licensor so to apply for Letters Patent covering such additional improvements, inventions or patentable ideas, the Licensee may apply for the same. In the event that such additional Letters Patent are applied for and are granted to the Licensor, they shall be deemed covered by the terms of this License Agreement and may be used by the Licensee hereunder without any further consideration, license fee or royalty as above provided. In the event that any such additional improvements are patented by the Licensee for use in connection with Transwrap Packaging Machines, (after the refusal or failure of the Licensor to apply for Patents thereon), the Licensor may, nevertheless, have the use but not the exclusive use of the same outside of the several territories covered by this License Agreement. The expenses of obtaining any such Patents shall be paid by the party applying therefor."

By another provision of the agreement, likewise challenged, it was provided that during the term of the license all improvement patents, whether secured by petitioner or by respondent, were to be included in the terms of the license without payment of an additional royalty. The petitioner, however, was to have the right to use and license the use of any such improvements outside the territories covered by the agreement.

remedy the default.   When that did not occur, petitioner notified respondent that the agreement would be terminated on a day certain.   Thereupon respondent instituted this action asking that the provisions respecting the improvement patents be declared illegal and unenforceable and that petitioner be enjoined from terminating the agreement.[2]

In a long and consistent line of cases the Court has held that an owner of a patent may not condition a license so as to tie to the use of the patent the use of other materials, processes or devices which lie outside of the monopoly of the patent.   *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502; *Carbice Corp.* v. *American Patents Dev. Corp.*, 283 U. S. 27; *Leitch Mfg. Co.* v. *Barber Co.*, 302 U. S. 458; *Morton Salt Co.* v. *Suppiger Co.*, 314 U. S. 488; *B. B. Chemical Co.* v. *Ellis*, 314 U. S. 495; *Mercoid Corporation* v. *Mid-Continent Co.*, *supra; Mercoid Corp.* v. *Honeywell Co.*, 320 U. S. 680.   As stated in *Morton Salt Co.* v. *Suppiger Co., supra,* p. 492, ". . . the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention.   It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant."   If such practices were tolerated,

---

[2] Petitioner joined issue and filed a counterclaim asking that the improvement patents be assigned, that the agreement be held terminated and that respondent be enjoined from using the original or improvement patents.   The District Court dismissed the complaint, declared the agreement terminated, and ordered respondent to assign the petitioner the improvement patents.   The Circuit Court of Appeals, on reversing, held not only that the provision for the assignment of the improvement patents was unlawful but also that petitioner was excused from any further performance because respondent had repudiated its agreement to assign those patents.   It remanded the cause to the District Court to determine whether petitioner was entitled to restitution.

ownership of a patent would give the patentee control over unpatented articles which but for the patent he would not possess. "If the restraint is lawful because of the patent, the patent will have been expanded by contract. That on which no patent could be obtained would be as effectively protected as if a patent had been issued. Private business would function as its own patent office and impose its own law upon its licensees." *Mercoid Corp.* v. *Mid-Continent Co., supra,* p. 667. The requirement that a licensee under a patent use an unpatented material or device with the patent might violate the anti-trust laws but for the attempted protection of the patent. *Id.* The condemnation of the practice, however, does not depend on such a showing. Though control of the unpatented article or device falls short of a prohibited restraint of trade or monopoly, it will not be sanctioned. *Morton Salt Co.* v. *Suppiger Co., supra.* For it is the tendency in that direction which condemns the practice and which, if approved by a court either through enjoining infringement or enforcing the covenant, would receive a powerful impetus. *Id.*

The Circuit Court of Appeals was of the view that the principle of those cases was applicable here and rendered illegal and unenforceable the covenant to assign the improvement patents to petitioner. It stated, 156 F. 2d, p. 202, "The owner of all property, by withholding it upon any other terms, may, if he can, force others to buy from him; land is the best example and every parcel of land is a monopoly. But it is precisely in this that a patent is not like other property; the patentee may not use it to force others to buy of him things outside its four corners. If the defendant gets the plaintiff's patents, it will have put itself in that position, in part at any rate, by virtue of the compulsion of its own patents."

It went on to note that since all improvement patents would not expire until after expiration of petitioner's pat-

ents on the machine, the arrangement put respondent at a competitive disadvantage. For respondent would lose the negative command over the art which ownership of the improvement patents would have given it. Moreover, respondent, though able to renew the license on conditions stated in the agreement, would be irretrievably tied to it so as to be "forced, either to cease all efforts to patent improvements, or to keep renewing the contract in order to escape the consequences of its own ingenuity." *Id.*, p. 203.

*First.* The first difficulty we have with the position of the Circuit Court of Appeals is that Congress has made all patents assignable and has granted the assignee the same exclusive rights as the patentee. "Every application for patent or patent or any interest therein shall be assignable in law by an instrument in writing, and the applicant or patentee or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent or patent to the whole or any specified part of the United States." R. S. § 4898, 35 U. S. C. Supp. V § 47. The statute does not limit the consideration which may be paid for the assignment to any species or kind of property. At least so far as the terms of the statute are concerned, we see no difference whether the consideration is services (cf. *Standard Parts Co.* v. *Peck*, 264 U. S. 52) or cash, or the right to use another patent.

An improvement patent may, like a patent on a step in a process, have great strategic value. For it may, on expiration of the basic patent, be the key to a whole technology. One who holds it may therefore have a considerable competitive advantage. And one who assigns it and thereby loses negative command of the art may by reason of his assignment have suffered a real competitive handicap. For thereafter he will have to pay toll to the assignee, if he practices the invention. But the competi-

tive handicap or disadvantage which he suffers is no greater and no less whether the consideration for the assignment be the right to use the basic patent or something else of value. That is to say, the freedom of one who assigns a patent is restricted to the same degree whether the assignment is made pursuant to a license agreement or otherwise.

If Congress, by whose authority patent rights are created, had allowed patents to be assigned only for a specified consideration, it would be our duty to permit no exceptions. But here Congress has made no such limitation. A patent is a species of property. It gives the patentee or his assignee the "exclusive right to make, use, and vend the invention or discovery" for a limited period. R. S. § 4884, 35 U. S. C. § 40. That is to say, it carries for the statutory period "a right to be free from competition in the practice of the invention." *Mercoid Corporation* v. *Mid-Continent Co., supra,* p. 665. That exclusive right, being the essence of the patent privilege, is, for purposes of the assignment statute, of the same dignity as any other property which may be used to purchase patents.

*Second.* What we have said is not, of course, a complete answer to the position of the Circuit Court of Appeals. For the question remains whether here, as in *Mercoid Corporation* v. *Mid-Continent Co., supra,* and its predecessors, the condition in the license agreement violates some other principle of law or public policy. The fact that a patentee has the power to refuse a license does not mean that he has the power to grant a license on such conditions as he may choose. *United States* v. *Masonite Corp.,* 316 U. S. 265, 277.

As we have noted, such a power, if conceded, would enable the patentee not only to exploit the invention but to use it to acquire a monopoly not embraced in the patent.

Thus, if he could require all licensees to use his unpatented materials with the patent, he would have, or stand in a strategic position to acquire, a monopoly in the unpatented materials themselves. Beyond the "limited monopoly" granted by the patent, the methods by which a patent is exploited are "subject to the general law." *United States* v. *Masonite Corp., supra,* p. 277. Protection from competition in the sale of unpatented materials is not granted by either the patent law or the general law. He who uses his patent to obtain protection from competition in the sale of unpatented materials extends by contract his patent monopoly to articles as respects which the law sanctions neither monopolies nor restraints of trade.

It is at precisely this point that our second difficulty with the view of the Circuit Court of Appeals is found. An improvement patent, like the basic patent to which it relates, is a legalized monopoly for a limited period. The law permits both to be bought and sold. One who uses one patent to acquire another is not extending his patent monopoly to articles governed by the general law and as respects which neither monopolies nor restraints of trade are sanctioned. He is indeed using one legalized monopoly to acquire another legalized monopoly.

*Mercoid Corporation* v. *Mid-Continent Co., supra,* and its predecessors, by limiting a patentee to the monopoly found within the four corners of the grant, outlawed business practices which the patent law unaided by restrictive agreements did not protect. Take the case of the owner of an unpatented machine who leases it or otherwise licenses its use on condition that all improvements which the lessee or licensee patents should be assigned. He is using his property to acquire a monopoly. But the monopoly, being a patent, is a lawful one. The general law would no more make that acquisition of a patent unlawful than it would the assignment of a patent

for cash. Yet a patent is a species of property; [3] and if the owner of an unpatented machine could exact that condition, why may not the owner of a patented machine?

It is true that for some purposes the owner of a patent is under disabilities with which owners of other property are not burdened. Thus where the use of unpatented materials is tied to the use of a patent, a court will not lend its aid to enforce the agreement though control of the unpatented article falls short of a prohibited restraint of trade or monopoly. *Morton Salt Co.* v. *Suppiger Co., supra.* There is a suggestion that the same course should be followed in this case since the tendency of the practice we have here would be in the direction of concentration of economic power that might run counter to the policy of the anti-trust laws. The difficulty is that Congress has not made illegal the acquisition of improvement patents by the owner of a basic patent. The assignment of patents is indeed sanctioned. And as we have said, there is no difference in the policy of the assignment statute whatever consideration may be used to purchase the improvement patents. And apart from violations of the anti-trust laws to which we will shortly advert, the end result is the same whether the owner of a basic patent uses a license to obtain improvement patents or uses the wealth which he accumulates by exploiting his basic patent for that purpose. In sum, a patent license may not be used coercively to exact a condition contrary to public policy. But what falls within the terms of the assignment statute is plainly not *per se* against the public interest.

It is, of course, true that the monopoly which the licensor obtains when he acquires the improvement patents extends

---

[3] See *James* v. *Campbell,* 104 U. S. 356, 358; *Hollister* v. *Benedict Mfg. Co.,* 113 U. S. 59, 67; *Cramp & Sons Co.* v. *International Curtis Co.,* 246 U. S. 28, 39–40; *United States* v. *Dubilier Condenser Corp.,* 289 U. S. 178, 187.

beyond the term of his basic patent. But as we have said, that is not creating by agreement a monopoly which the law otherwise would not sanction. The grant of the improvement patent itself creates the monopoly. On the facts of the present case the effect on the public interest would seem to be the same whether the licensee or the licensor owns the improvement patents.

There is a suggestion that the enforcement of the condition gives the licensee less incentive to make inventions when he is bound to turn over to the licensor the products of his inventive genius. Since the primary aim of the patent laws is to promote the progress of science and the useful arts (*United States* v. *Masonite Corp., supra,* p. 278 and cases cited), an arrangement which diminishes the incentive is said to be against the public interest. Whatever force that argument might have in other situations, it is not persuasive here. Respondent pays no additional royalty on any improvement patents which are used. By reason of the agreement any improvement patent can be put to immediate use and exploited for the account of the licensee. And that benefit continues so long as the agreement is renewed. The agreement thus serves a function of supplying a market for the improvement patents. Whether that opportunity to exploit the improvement patents would be increased but for the agreement depends on vicissitudes of business too conjectural on this record to appraise.

*Third.* We are quite aware of the possibilities of abuse in the practice of licensing a patent on condition that the licensee assign all improvement patents to the licensor. Conceivably the device could be employed with the purpose or effect of violating the anti-trust laws. He who acquires two patents acquires a double monopoly. As patents are added to patents a whole industry may be regimented. The owner of a basic patent might thus per-

petuate his control over an industry long after the basic patent expired. Competitors might be eliminated and an industrial monopoly perfected and maintained.[4] Through the use of patent pools or multiple licensing agreements the fruits of invention of an entire industry might be systematically funneled into the hands of the original patentee. See *United Shoe Machinery Co.* v. *La Chapelle,* 212 Mass. 467, 99 N. E. 289.

A patent may be so used as to violate the anti-trust laws. *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20; *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436; *United States* v. *Masonite Corp., supra.* Such violations may arise through conditions in the license whereby the licensor seeks to control the conduct of the licensee by the fixing of prices (*Ethyl Gasoline Corp.* v. *United States, supra; United States* v. *Masonite Corp., supra*) or by other restrictive practices. *United Shoe Machinery Corp.* v. *United States, supra.* Moreover, in the Clayton Act, 38 Stat. 730, 731, 15 U. S. C. § 14, Congress made it unlawful to condition the sale or lease of one article on an agreement not to use or buy a competitor's article (whether either or both are patented), where the effect is "to substantially lessen competition or tend to create a monopoly." See *International Business Machines Corp.* v. *United States,* 298 U. S. 131. Congress, however, has made no specific prohibition against conditioning a patent license on the assignment by the licensee of improvement patents. But that does not mean that the

---

[4] See Patents and Free Enterprise, Monograph No. 31, Investigation of Concentration of Economic Power, Temporary National Economic Committee, 76th Cong., 3d Sess., chs. V & VII; Wood, Patents and Antitrust Law (1941), chs. 3 & 4; Marcus, Patents, Antitrust Law and Antitrust Judgments through Hartford-Empire, (1945–46) 34 Georgetown L. J. 1.

practice we have here has immunity under the anti-trust laws. Indeed, the recent case of *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 324 U. S. 570, dramatically illustrates how the use of a condition or covenant in a patent license that the licensee will assign improvement patents may give rise to violations of the anti-trust laws.[5]

The District Court found no violation of the anti-trust laws in the present case. The Circuit Court of Appeals did not reach that question. Hence it, as well as any other questions which may have been preserved, are open on our remand of the cause to the Circuit Court of Appeals.

We only hold that the inclusion in the license of the condition requiring the licensee to assign improvement patents is not *per se* illegal and unenforceable.

*Reversed.*

MR. JUSTICE BLACK, MR. JUSTICE RUTLEDGE, and MR. JUSTICE BURTON would affirm the judgment for the reasons set forth in the opinion of the Circuit Court of Appeals.

MR. JUSTICE MURPHY is of the view that the judgment below should be affirmed. He believes that the Court's decision in this case unduly enlarges the scope of patent monopolies and is inconsistent with the philosophy enunciated in *Mercoid Corporation* v. *Mid-Continent Co.,* 320 U. S. 661, and similar cases.

---

[5] See note 45 Col. L. Rev. 601.