[No. 5072.  Decided October 14, 1905.]

THE SEATTLE ELECTRIC COMPANY, *Respondent,* v.
SNOQUALMIE FALLS POWER COMPANY
*et al., Appellants.*[1]

SPECIFIC PERFORMANCE—INJUNCTION—CONTRACTS—ELECTRIC POWER FOR RAILROAD—PUBLIC INTEREST—EVIDENCE. In an action for an injunction to compel a power company to perform its contract to furnish power to a street railroad company, the evidence sufficiently shows the necessity where it appears that the facilities of the street railroad company for generating power were not sufficient to create any reserve force, which is necessary to furnish power for continuous use.

SAME — CONTRACTS — VIOLATING FRANCHISES — ENFORCEMENT. A court of equity will compel the performance of a contract of a power company to furnish power to a street railroad company, for a reasonable time to enable the company to obtain a supply from other sources, where the public interests are involved and require it, notwithstanding the contract was not enforcible between the parties owing to a clause therein violating the franchise of the power company.

Appeal from a judgment of the superior court for King county, Hatch, J., entered October 6, 1903, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, granting a mandatory injunction

[1] Reported in 82 Pac. 713.

compelling the defendants to continue to furnish electric power. Affirmed.

*Thomas B. Hardin,* for appellants.

*Piles, Donworth & Howe,* for respondent.

PER CURIAM. — The appellant Snoqualmie Falls Power Company was incorporated in January, 1898, for the purposes of manufacturing and selling electricity to public and private consumers, for heat, light, and power purposes. Its capital stock was fixed at $500,000, divided into 5,000 shares of the par value of $100 each, all of which with the exception of four were subscribed for, and have since been owned, by one William T. Baker. In August, 1898, the city of Seattle granted a franchise to the said Baker, running for a period of 36 years, conferring upon him the right to erect poles upon the streets of that city and string wires thereon for the purposes of distributing therein electricity generated at the power plant of the Snoqualmie Falls Power Company. The franchise contained a number of restrictions intended for the benefit of the consumers of the product of the plant. It required the grantee to distribute the current manufactured by him at "his Snoqualmie Falls Power House" to "all persons and corporations desiring the same" on equal terms and under reasonable regulations, and prohibited him from entering into any combination whatsoever whereby the public or the city would be deprived of the benefits of competition in the purchase of electricity. Immediately on obtaining this franchise, Baker organized another corporation called the Seattle Cataract Company, and assigned to this company all the rights he had acquired by the grant to him of the above mentioned franchise. The capital stock of this company was fixed at $100,000, divided into 1,000 shares of the par value of $100 each. Of these shares Baker has likewise owned the entire issue except a mere nominal number.

In January, 1900, the respondent corporation was organ-

ized. At that time the street railways and the electric lighting systems of the city of Seattle were under the control of a number of companies and corporations, operating separately and independently of each other, and the respondent was incorporated for the purpose of acquiring and consolidating these into one system. To that end it succeeded in purchasing almost the whole thereof, since which time it has been, and was at the time of the commencing of this action, engaged in the business of conducting street railways in the city of Seattle and its suburbs, having in operation at the last mentioned time some seventy-nine miles of track. It was also engaged in the business of supplying electric lights for public and private use, and electricity for power purposes to private owners as well as to the city of Seattle.

On January 20, 1900, the respondent entered into a contract with the Snoqualmie Falls Power Company by the terms of which the latter company agreed to sell to the former three thousand (3,000) continuous electrical horse power, to be delivered at such time or times and in such quantities as might be called for by the respondent, for the sum of fifty-four thousand ($54,000) dollars per annum (being at the rate of $18 per horse power per annum), to be paid in monthly installments; agreeing further to allow the purchasing company a certain excess of power in case it might desire it at the same rate per horse power per annum it paid for the 3,000 horse power. This additional power was afterwards fixed at 250 continuous horse power. The contract entered into between the parties contained numerous conditions, among which was a condition to the effect that no electric current should be sold in the city of Seattle by the Snoqualmie Falls Power Company to be used in any branch of business in which the respondent was engaged, a condition in direct violation of the ordinance under which electric current was permitted to be brought from the power plant of the Snoqualmie Falls Power Company into the city of Seattle.

The parties continued to operate under the terms of this contract until the morning of May 24, 1903, when the Snoqualmie Falls Power Company, in violation of the terms of the contract, and without notice, cut the connection between its generator and the respondent's power plant; and, when inquiry was made as to cause, stated that it had decided not to continue any longer in the performance of the contract. Thereupon the appellant brought this action against it and against the Seattle Cataract Company, to compel the performance of the contract. A temporary mandatory injunction was issued compelling the appellants to furnish the power until a final hearing could be had on the question at issue between the parties, and on this hearing the injunction was continued in force until June 1, 1904, the court granting to the respondent that length of time in which to obtain power from other sources. The appeal is from the last mentioned judgment.

In its complaint the respondent set out the contract above mentioned, and alleged a compliance therewith on its own part. It further alleged that it was a public service corporation engaged in the business of operating street car and electric light systems in the city of Seattle by electric power; that its own generating plants were not designed for and were insufficient to furnish the power necessary to operate its systems; and that, unless the appellant Snoqualmie Falls Power Company should be compelled to continue in the performance of its contract, it would be unable to keep its system of railways and lights in operation, thereby causing great annoyance and injury to the public and to those who were dependent upon it to furnish them with transportation and light; and that already great confusion had been caused by the cutting off of the power theretofore furnished it by the appellant last named. The prayer was for relief appropriate to the allegations of its complaint. The appellants, answering, denied that the respondent was without means of its own to generate sufficient power for its own use; and

set out affirmatively the negotiations leading up to the formation of the several corporations, the execution of the contract, and averred that the contract was designed to create a monopoly and was in direct violation of the franchise granted to Baker, under which the appellant corporations operated, and was therefore null and void, and such as a court of equity would not enforce. The reply was a denial of all of the affirmative allegations of the complaint going to show a participation by the respondent in any unlawful acts, or acts against public policy, or knowledge on its part of any violations of their franchise or of public policy by the appellants.

The evidence in the case is voluminous, and the arguments of counsel in this court have taken a wide range, but it seems to us that the real question presented by the record is one not difficult of solution. It will be remembered that the trial court did not undertake in its judgment to compel a specific performance of the contract between the parties, but held that the evidence justified the conclusion that the facilities under the command of the respondent were not then sufficient to enable it to generate sufficient electric current to enable it to operate in an efficient manner the public facilities it was required by its franchise to operate, and it required the appellants to continue to furnish the power the respondent had contracted with it to furnish, and had relied upon, only until such reasonable time as the respondent could supply itself from other sources. The only questions presented, therefore, are, did the court err in its finding that the respondent had not sufficient facilities under its own command to enable it to operate sufficiently the public conveniences operated by it; and, after finding that it did not, did it err in holding as a matter of law that the appellants could be compelled to furnish the power they had contracted to furnish until the respondent could with reasonable diligence acquire such facilities. Both of these questions we think should be answered negatively. It must be borne in mind

that the questions are not reviewed out of any regard for the appellants. Their confessed violation of their duties to the public cannot be overlooked when they seek redress in a court of equity. Moreover, we cannot but feel that their conduct in cutting off the current they had agreed to furnish found its inspiration in the fact that they had discovered a place where they could dispose of it on more profitable terms than the contract afforded them, rather than from any compunctions of conscience because of their past misconduct. But the respondent seems from the evidence not to have been entirely free from blame in its contract with the appellants, hence it is proper to inquire whether it could have performed the public duties required of it without the aid of the power furnished it by the appellants. The evidence reasonably justifies the conclusion that it could not. While it may have had sufficient facilities for generating power to have carried the load required of it even at its most extreme point, it is made clear that this is not sufficient to constitute a safe working basis. Machinery, no matter how perfectly made, will get out of repair, and it is found that, to furnish power for continuous use, there must be a reserve force equal to the largest single unit used in generating such power. This the respondent did not have, and its claim that power from the appellants' power plant was necessary to secure an uninterrupted service seems to have been justified.

Conceding that the power was necessary, there can be no serious dispute over the questions of law invloved. While courts of equity will not enforce contracts entered into either in violation of positive law or a rule of public policy where the interests of the parties thereto are alone involved, yet, when the public interests are involved, it will enforce such a contract as long as such public interest requires it. It would have been a greater wrong than any to which the appellants confessed to have permitted them arbitrarily and without warning to stop from operation the street car and lighting

systems of the city of Seattle; especially when the only justification offered for it is a former willful violation of their franchise privileges. Neither courts of law nor equity will lend countenance to a plea so utterly without justification.

The judgment appealed from is affirmed.