S. K. FLEMMING, *Appellee*, v. THE TAYLOR FUEL, LIGHT
AND POWER COMPANY et al. (THE NATURAL GAS
COMPANY, *Appellant*).

No. 18,367.

SYLLABUS BY THE COURT.

1. GAS COMPANY—*Mortgage Sale—Liability of Purchaser Oper-
ating Plant under Same Franchise.* Where a mortgagee of a
gas-distributing company took possession of the mortgaged
plant and franchises, together with its records, books and busi-
ness, and carried on the same business with the same prop-
erty under the same franchise, it will be presumed, in the
absence of evidence to the contrary, that the mortgagee in-
tended to respond to corresponding obligations imposed by the
franchise, or incidental to the rates it collected.

2. NEW CORPORATION—*Operating under Same Franchise as Old
Corporation—Agent of Parent Corporation.* Where a cor-
poration, organized by the officers of an investment company
for the purpose of purchasing property and franchises of a
gas-distributing company mortgaged to the investment com-
pany, purchased the property at a mortgage sale without con-
sideration except the interest its incorporators might own in
the mortgage as shareholders in the investment company, and
thereafter the new company carried on the business first con-
ducted by the mortgagor, and afterwards by the mortgagee,
it is held that the new company should be considered as an
agent of the parent company in the purchase and operation
of the plant.

3. GAS COMPANY—*Franchise — Discontinuing Business — Condi-
tions Imposed by Court Reasonable.* While in possession and
carrying on the business the investment company and the
new company enjoyed the franchises and privileges granted
by ordinance of the city to the mortgagor, collected rates and
settled outstanding accounts with customers upon the books,
and otherwise continued the business as their predecessor, the
mortgagor, had done. The new company desired to discon-
tinue the business and remove the property. The district court
permitted this to be done, but required that it should first give
thirty days' notice of its intended withdrawal and repay to
consumers deposits which had been made with the mortgagor
as security for the payment of gas bills. It is held that these
conditions are reasonable in view of the nature of the service
and the conduct of the companies so taking possession of the
property, continuing the business and receiving the benefits.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed November 8, 1913. Affirmed..

*Altes H. Campbell, John F. Goshorn,* both of Iola, and *Curtis M. Oakes,* of Oswego, for the appellant.

*Baxter D. McClain, H. A. Ewing, S. A. Gard,* and *G. R. Gard,* all of Iola, for the appellee.

The opinion of the court was delivered by

BENSON, J.: This appeal was taken by the Natural Gas Company from a judgment against it for an injunction.

On November 22, 1904, an ordinance was adopted by Gas, a city of the second class, granting to the Taylor Fuel, Light & Power Company the right for twenty years to furnish natural gas to its inhabitants and to the use of its streets for that purpose. Among other conditions a rate of fifteen cents per thousand cubic feet of gas was allowed. The Taylor company accepted the terms of the ordinance and established its gas plant and furnished gas to consumers, at first at flat rates, but in November, 1910, it purchased and installed meters, requiring, however, of each consumer as a condition for placing a meter in his premises the payment of ninety cents, cost of installation, and a deposit of five dollars, giving a receipt in the following form:

"OCT. ——, 1910.

"Received of ............... (here name of customer) Deposit of Five Dollars, $5.00, to guarantee the payment of gas bill and to care for Ironclad Meter No. .... (here insert No. of meter), at his premises.

E. K. TAYLOR,      (SEAL.)
President.   (T. F. L. & P. Co.)

"This receipt must be returned when deposit is taken up."

Because of a diminution in the flow of gas the meter rate was increased to twenty-five cents per thousand feet by consent or agreement between all interested

parties, and the service was continued at that rate by the Taylor company while it remained in possession of the plant.

On March 1, 1905, while carrying on its business under the ordinance the Taylor company mortgaged the property to the Deming Investment Company to secure a loan.   Following a description in the mortgage of certain lots, leases and gas wells is the following:

"All and singular the pipes, mains, branches, branch castings, connections, service boxes, fittings, meters, lamps, lamp posts, regulators, valves, casings, drips, drilling machinery and tools, derricks and all appurtenances and appliances of every description connected with wells, leases, lines, and gas plant of said Company, and all and singular the rights, franchises, leases, contracts, benefits, privileges, and property, both real and personal, now owned or which may hereafter, be acquired by said party of the first part, at any time.   The mentioning or not mentioning of any particular property, or giving or not giving a description thereof, shall not be taken as excluding or releasing from the obligation of this mortgage, other property or rights not mentioned or described, but owned or enjoyed by said Mortgagor."

This mortgage was foreclosed in an action commenced by the investment company in the district court and a judgment was rendered October 11, 1911, against the Taylor company for over $10,000, and for a sale of the mortgaged property (except certain real property) in accordance with the law governing the sales of mortgaged personal property.   The judgment directed that possession of the property be given to the mortgagee, and possession was taken accordingly together with the books, records, blanks, franchises and business of the Taylor company.   After due notice the mortgagee sold the property on January 4, 1912, to the Natural Gas Company, a Kansas corporation organized on January 3, 1912, by officers and employees of the investment company.   The investment company, mortgagee, operated the gas plant from the 4th of

December, 1911, to the 5th of January, 1912, when it delivered possession to the gas company. On January 2, 1912, before the mortgage sale, the gas company or some of its officers applied to the city for a franchise allowing a rate of thirty cents per thousand cubic feet and allowing it to require a meter deposit from each consumer of $5 as a condition of furnishing gas. The city took no action upon the proposed franchise. On January 30, 1912, the gas company, while carrying on the business, notified the pipe-line company from which it obtained the greater part of its supply at a rate of fifteen cents per thousand feet that it would not, after January 22, pay in excess of eight cents per thousand feet. On January 25, 1912, the gas company filed in this action (which was commenced on January 17) an affidavit stating that it claimed no right under the franchise of the Taylor company; that it had, in anticipation of acquiring the plant, applied to the city for a franchise, which had been refused; that it had operated the plant temporarily without any franchise; that the Taylor franchise had expired because the gas supply mentioned in it had been exhausted; and that the plant could not be operated at a profit on account of the necessity of purchasing gas at prevailing prices.

On February 28, 1912, while this action was still pending, the gas company notified the city and the consumers of gas that it would in thirty days shut down the plant, retire from the business, and remove its pipes, connections and other property from the streets. The service, however, was not discontinued.

The business of supplying gas was carried on by the investment company after it took possession, and by the gas company after making the purchase, in the same manner in which it had been done by the Taylor company. The books and records of the Taylor company were continued by the investment company while it held possession and by the gas company afterwards.

The investment company while so in possession received meter deposits from customers and gave credit for and refunded deposits in settling outstanding bills. The gas company also continued to receive such deposits while operating the plant.

All the stockholders of the gas company are officers of the investment company, including the president, vice president, secretary, treasurer, and auditor of the latter company, all of whom except the president are also officers of the gas company.

Neither of the defendant companies has returned, or offered to return, the deposits made with the Taylor company. In applying for a franchise containing a provision providing for such deposits it was not contemplated by the gas company that the deposits theretofore paid to the Taylor company should be returned or accounted for. The value of the material acquired by the gas company was $5100. The meters were of the value of $7.50 each.

The ordinance under which the Taylor company operated provided that it should supply gas so long as it could be obtained from certain specified sources, or from any other source sufficient for the purpose. The Portland Gas & Pipe Line Company, from which gas was being obtained, was still able and willing to continue the supply at fifteen cents per thousand feet, although the supply in the field was being depleted at the time of the trial.

After the increase in rates before referred to the supply from the particular sources named in the ordinance was exhausted, leaving only the Portland Gas & Pipe Line supply. As a result of this diminution factories were shut down, houses were vacated, and people moved away, until at the time of the hearing there were approximately one hundred and fifty consumers of gas in the city.

Findings were made of the length and condition of

mains and pipes, cost of laying pipe lines, installing meters, regulators, etc. Also of entries of receipts and expenses upon the books of the gas company from December 19, 1911, to March 18, 1912, showing a loss in operation. The court did not, however, make any specific finding that the business could, or could not, be continued at a profit.

This action was brought by a consumer who had made a deposit with the Taylor company of $5, for the benefit of all others similarly situated, against the Taylor company, the investment company, and the gas company, alleging the grant to the Taylor company, that the other companies had assumed charge of the plant as successors of the Taylor company and were about to cease operations without returning the meter deposits, and praying for an injunction forbidding discontinuance of the supply without returning the deposits, and until the expiration of a reasonable time after notice. The city intervened, pleaded the contract embraced in the ordinance, averred acceptance, operation and the enjoyment of benefits under it, and prayed for an injunction forbidding discontinuance of the service, for a receiver to continue operations if necessary, and for general relief.

The gas company answered pleading its purchase of the property, but averring that it had not assumed any obligation for the debts of the Taylor company or for the meter deposits, and disclaiming any rights under the Taylor franchise. It also alleged that the supply had failed so far that gas could not be furnished to consumers at a profit at rates fixed in the ordinance. The trial was concluded and judgment entered June 24, 1912, based upon an agreed statement of some of the facts and findings of others. So far as deemed material to this decision these facts and findings are embraced in this statement. The action was dismissed as to the Taylor company, upon which service was not ob-

tained, and the investment company.   Judgment was rendered against the Natural Gas Company as follows:

"It is Therefore Considered, Ordered, Adjudged and Decreed, That a permanent injunction be granted herein ordering and directing the defendant, The Natural Gas Company, a corporation, or any one acting by, through or under it, to continue to furnish natural gas to the city of Gas and its inhabitants (among whom is plaintiff in this action) and keep and maintain such service as is provided by Ordinance No. 82, of said city of Gas, at the rate of charge of twenty-five cents (25c) per one thousand (1000) cubic feet, as by consent and agreement has heretofore been done, and said defendant The Natural Gas Company, a corporation, refrain from shutting off or discontinuing the furnishing of natural gas to said city of Gas and its inhabitants."   (Here follows a proviso permitting gas to be shut off for failure to pay bills or violation of regulations.)

The judgment further provides that the gas company may discontinue operations and remove its plant upon thirty days' notice, if done before October 1, if done later, upon sixty days' notice, but that before commencing such removal it should return the deposits which had been made as security for gas bills to the Taylor company.   The application of the plaintiff and the city for a receiver was reserved for future consideration to enforce the judgment should occasion arise, and judgment was rendered against the gas company and the city for costs.

Many errors are assigned, which in view of the judgment allowing discontinuance of the service upon the two conditions only, need not now be considered.   As the gas company desires to discontinue operations and the city did not appeal, the only question to be decided is whether the service must be continued by the gas company until it gives the notice and pays back the deposits.

Objection was made to oral evidence of a conversa-

49—90 KAN.

tion accompanying a receipt by the Taylor company for such a deposit, tending to prove a promise to return it upon payment of arrearages. This evidence, while competent, proved nothing not shown by the receipt and the circumstances. The obvious purpose of these deposits was to protect the company from risk of losses and expenses in collecting many small amounts from defaulting customers. It follows that upon discontinuance of the service for any reason other than the default of the customer his deposit should be returned to him, or applied upon any balance against him. It is his money, held only as security. If the deposits had been delivered over to the successors of the Taylor company, no serious question would arise, for the liability to account to the contributors would follow the fund. It was not, however, so delivered, and the gas company contends that the deposits constitute debts of the Taylor company only. On the other hand, it is insisted that the gas company, succeeding as it did, to all the property and the franchises, privileges, records, books and business, and collecting whatever was due, is also charged with the corresponding liability to account for the deposits, and that to enforce this liability the condition imposed in the decree was equitable.

It must be remembered that the investment company, as mortgagee of the Taylor company, took possession of the property mortgaged, including the corporate franchise, books and business before referred to, and continued the business as it had been before conducted by the mortgagor, and that the gas company continued the business in the same manner, using the same property, records and books during its possession, receiving and giving credit for meter deposits. These companies collected oustanding accounts due to the Taylor company; accounts in which these deposits appeared. We need not inquire whether these accounts passed by the mortgage. They were taken, held and appropriated with the consent of the

Taylor company. It should also be observed that the investment company, and afterwards the gas company, enjoyed all the privileges granted by the ordinance to the Taylor company to furnish gas, use the streets and collect rates. While a corporation can not sell or mortgage its primary franchise to exist, owned by the incorporators, it may alienate or encumber the secondary franchises belonging to the corporation, including privileges granted by a city, such as the right to operate its plant, supply gas or water, and collect rates. (*The State v. Water Co.*, 61 Kan. 547, 560, 60 Pac. 337; Joyce on Franchises, § 38.) It has been held that a purchaser at a foreclosure sale embracing such a franchise succeeds to the right to collect rates granted in a franchise to the mortgagor. (*Omaha Water Co. v. Omaha*, 77 C. C. A. 267, 147 Fed. 1, 12 L. R. A., n. s., 736.) In this instance the privilege was exercised without hindrance, and the right is not questioned by the plaintiff. The question here is, Shall the mortgagee, or the gas company succeeding to its rights, using the privileges granted by the city and receiving the benefit of the accounts with and patronage of consumers, bear the incidental burdens? May it receive the rates without incurring any liability in respect to the deposits which were made to facilitate the collection of rates? Having elected, presumably in order to conserve the value of the plant as a going concern, to continue its operation, enjoying without hindrance all the rights and privileges of the mortgagor, it must be presumed that it intended to respond to the corresponding obligations. An agreement to do so may fairly be implied from its conduct.

"He who derives the advantage ought to sustain the burthen." (Broom's Legal Maxims, 7th Eng. ed., p. 537.)

"If a person accepts anything which he knows to be subject to a duty or charge, it is rational to conclude that he means to take the duty or charge upon himself; and the law may very well imply a promise to

perform what he so takes upon himself." (Abbott's Law of Merchant Shipping, 13th ed., p. 566; *Lucas and others v. Nockells*, 1 Cl. & Fin. 438, 457; *Pfeifer v. The Sheb. & F. du L. R. R. Co.*, 18 Wis. 164.)

In arriving at this conclusion the nature of the service contemplated in the grant to the Taylor company is considered. That company was a public-service corporation. Citizens were entitled to the service on compliance with reasonable conditions, and the service could not be arbitrarily abandoned. (Joyce on Franchises, § 63.) In the ordinary course of the business deposits were demanded and made as a condition of obtaining the supply. To cut off the supply without any default of the consumers and without returning their money is plainly unjust. A resort to the Taylor company, even if solvent, might involve expenditures by each depositor greater than the amount due him. But it is said that the mortgage is a fixed lien, that the mortgaged property taken did not satisfy the debt, and that the mortgagee is not liable for the debts of the Taylor company. This argument might prevail if the investment company and its agency, the gas company, had not enjoyed privileges and secured benefits under the franchise, and in the collection of rates from which incidental and corresponding burdens can not equitably be divorced.

It seems to be insisted that the gas company should be immune from liability for these deposits as an innocent purchaser, whatever may be the liability of the investment company. It is apparent, however, that the gas company is a mere agency created by the investment company for its convenience. Nothing was paid at the mortgage sale. The consideration, claimed to be the individual interest in the mortgage debt of shareholders of the investment company, who were the incorporators of the gas company, is vague and unsubstantial. The same persons acted as officers and agents in the same capacities in the operation of the plant for

both companies.  These reasons might be amplified but it is unnecessary, for even if insufficient, the gas company, supposing it to be an independent concern, was nevertheless a successor enjoying the privileges granted first to the Taylor company, including the right to collect rates, and is subject to the same incidental burdens.

It is argued that as the court found that the books showed the receipts were less than the expenses for three months, the business could not be carried on, and therefore the order to do so even for a limited period was unjust.  Two answers to this claim are readily suggested.  The evidence shows that claims not incidental to the operation of the plant were included in the expense account, and that there was a large excess in gas purchased of the pipe-line company not shown in receipts from customers after allowing for the usual shrinkage in distribution.  What the court might have found, had a finding been requested upon the question whether the service efficiently conducted could be made profitable, is not known.  Conceding, however, that the business would not pay, it does not follow that it should be summarily discontinued without the imposition of equitable conditions.  It is well settled that a reasonable notice in order to afford customers an opportunity to obtain service from another source and for adjustment to the new situation should be required.  (1 Wyman on Public Service Corporations, §§ 316, 317.) This rule has been held to apply even when the customer who invoked it was being supplied under an illegal contract.  (*Seattle Elec. Co. v. Snoqualmie Falls P. Co.;* 40 Wash. 380, 82 Pac. 713, 1 L. R. A., n. s., 1032.)  The other condition, of repayment of deposits, is equally equitable, resting upon the nature of the service wherein the customer had no practical choice to make or refuse to make the deposit, and upon the ground already considered, of an implied obligation to assume the burdens incident to the enjoyment of the privileges and the collection of the rates.  The notice

given during the pendency of the suit might have been sufficient if the defendant had also offered to return the deposits. Being still compelled to prosecute the suit in order to enforce this condition the court required a further notice, which in the circumstances was just.

By the decision of the district court the company is left free to withdraw from the service if it chooses. The court only fixed the time and conditions of such withdrawal, which appear to be reasonable in view of the nature of the service and conduct of the successors of the mortgagor concerning it.

Questions analogous to those considered in this opinion are discussed in *Altoona v. Richardson,* 81 Kan. 717, 106 Pac. 1025; *Williams v. Commercial Nat. Bank,* 49 Ore. 492, 90 Pac. 1012, 11 L. R. A., n. s., 857; *Northern Pacific Ry. v. Boyd,* 228 U. S. 482; and 33 Cyc. 597.

The judgment is affirmed.