EMPIRE GAS & FUEL CO., Inc., v. LONE STAR GAS CO., Inc.

(District Court, N. D. Texas, at Dallas. May 28, 1923.)

1. **Monopolies ⬤═12(2)—Contract for sale of gas wells by one corporation to another held to effect an illegal trust under Texas statute.**

    A contract for the sale by one corporation to another of all its gas wells, the purpose and effect of which would be to prevent competition between them in supplying gas to communities, *held* to effect an illegal trust, and void under Vernon's Sayles' Ann. Civ. St. Tex. 1914, arts. 7796, 7797, 7807.

2. **Specific performance ⬤═55—Illegal contract not enforceable.**

    A court of equity will not decree specific performance of a contract which is illegal, as between the parties nor unless some public interest is involved which requires its enforcement.

3. **Specific performance ⬤═55—Contract in violation of express statutory restriction will not be enforced.**

    A contract which is in violation of an express statutory restriction will not be specifically enforced by a court of equity.

4. **Specific performance ⬤═8—Decree rests in sound judicial discretion of court.**

    A decree for specific performance is not a matter of right, but rests in the sound judicial discretion of the court, to be exercised in accordance with the established doctrines and settled principles of equity.

5. **Specific performance ⬤═87—Party seeking enforcement must be able to perform.**

    A court of equity will not decree specific performance of a contract, where the party seeking performance cannot perform a substantial part of it.

In Equity. Suit by the Empire Gas & Fuel Company, Incorporated, against the Lone Star Gas Company, Incorporated. Decree for defendant.

Etheridge, McCormick & Bromberg, of Dallas, Tex., for plaintiff.

Lawther, Pope & Leachman and Karl F. Griffith, all of Dallas, Tex., for defendant.

ATWELL, District Judge. The specific performance of a written agreement executed on the 28th day of May, 1920, by the plaintiff and defendant, by the vice president and president respectively, of the two corporations, is sought. The agreement was made in New York City, and followed previous offerings and refusals.

The plaintiff and the Allied Oil Corporation and the Texas & Pacific Coal & Oil Company had theretofore arranged a merger of their gas interests in what was known as the Mineral Wells field, in Palo Pinto county, Tex., having in view the building of a pipe line from that field into or near Fort Worth, Tex., a distance of some 50 miles, for the purpose of supplying gas to industries in Fort Worth. Such combination was within the knowledge of the defendant, and was made known to its president by certain officers of the plaintiff, and probably spurred the defendant's president to the making of the agreement.

Before and on May 28, 1920, the plaintiff, the defendant, and the Allied Oil Corporation owned practically all of the gas leases in the Mineral Wells field and were competitors in the production of gas in that field. The agreement entered into, was as follows:

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"This agreement made and entered into this 28th day of May, 1920, by and between the Empire Gas & Fuel Company, a corporation of the state of Maine licensed to do business in the state of Texas, hereinafter referred to as the 'Empire Company' party of the first part, and the Lone Star Gas Company, a corporation of the state of Texas, hereinafter referred to as the 'Star Company,' party of the second part, witnesseth:

"Whereas, the Empire Company has certain interest in oil and gas leases, in what is known as Mineral Wells field, in Palo Pinto and Parker counties, Texas, consisting of seventeen thousand (17,000) acres, more or less, within a radius of eight miles from a well known as the J. A. Chestnut gas well, located on the George Green survey, north of the Brazos river and south of Mineral Wells, Palo Pinto county, Texas, together with gas wells, pipe lines, equipment, etc., within said area; and;

"Whereas, the Empire Company desires to sell all the right, title and interest it has to the gas under all of said oil and gas leases, with the right to drill and operate thereon, all subject to the terms of the leases, together with all gas wells, pipe lines, equipment, etc., within said area, and the stock of the Texas Distributing Company, to the Star Company, and the Star Company desires to purchase the same upon the terms hereinafter specified:

"Now, therefore, in consideration of the sum of ten dollars ($10.00) paid by the Star Company to the Empire Company, the receipt of which is hereby acknowledged, and other valuable considerations, the parties hereto agree as follows:

"First. The Empire Company hereby sells, and the Star Company hereby purchases from the Empire Company, all the right, title, and interest of the Empire Company to all gas and gas wells, gas equipment, such as pipe lines, gates valves, regulators, etc., together with all drilling equipment used in connection with the gas operations (such gas and drilling equipment to include all equipment of the Empire Company within said area and now used in connection with oil operation, and which gas and drilling equipment is approximately of the value of $25,000) in or under the lease or leases above mentioned, or within said area, and all of the stock of the Texas Distributing Company, a corporation of Texas, consisting of one hundred thousand dollars ($100,000) par value issued and outstanding, for the price of four hundred and fifty thousand dollars ($450,000) payable as follows: One hundred and twenty thousand dollars ($120,000) cash, and three (3) promissory notes of the Star Company to the Empire Company, bearing 6 per cent. interest per annum, each for one hundred and ten thousand dollars ($110,000), payable one in six months, one in twelve months, and one in eighteen months from the date of said notes; said cash to be paid and notes delivered by the Star Company at the time the Empire Company delivers to the Star Company the assignments of title and other instruments as hereinafter provided, and the stock of said Texas Distributing Company indorsed in blank, properly stamped and ready for transfer, all in a form reasonably satisfactory to the Star Company.

"Second. Forms of the assignment, bill of sale, release from mortgage, etc., are to be delivered to the Star Company at its office in Dallas, Texas, by June 5, 1920, or as soon thereafter as practicable, and the Star Company shall, within ten (10) days after such delivery, notify the Empire Company of its objections, if any, to the form of the papers, and the Empire Company will, within ten (10) days after the termination of the period hereby allowed for examination of said forms, deliver to the Star Company proper instruments of assignment, bill of sale, release from mortgage, etc., and the stock of said Texas Distributing Company, indorsed in blank ready for transfer, and such other papers as are necessary to consummate this transaction.

"At the time of the delivery of said stock of the Texas Distributing Company, the Empire Company will furnish, or cause to be furnished and delivered, to the Star Company, or its nominee, the resignations of all officers and directors of the said Texas Distributing Company and will, as may be requested by the Star Company, and so far as necessary, elect or cause to be elected such directors and officers as the Star Company or its

nominee may request, to fill the vacancies caused by such resignations. The Empire Company will, at the same time, deliver to the Star Company, or its nominee, the minute book, stock book, seal, books of account, and other proper corporate records of said Texas Distributing Company.

"It is understood that the Star Company takes over the business of the Texas Distributing Company as of June 1, 1920, and an adjustment as of June 1, 1920, between good current assets and current liabilities shall be made prior to July 1, 1920, between the Empire Company and the Star Company, so that one shall offset the other, and otherwise said Texas Distributing Company shall be free of any other liability. It is understood, however, that current assets shall not include stores and supplies other than new business appliances; in other words, under this contract the Star Company is acquiring through the purchase of the Texas Distributing Company common stock, all of the physical property held as of June 1, 1920, by the Texas Distributing Company, not including cash on hand or in 'bank, good accounts receivable, and new business appliances, such as ranges, heaters, etc., free from all indebtedness of whatever form or description.

"Third. It is understood that a well that is now being drilled in said area, known as the Edmondson well, is to be completed and turned over to the Star Company free of cost. By completion it is meant that the Chestnut sand is to be shot and the well closed in as a gas well, in a workmanlike manner. The well now being drilled therein by the Star machine is to be completed to the shallow sand, and said well and drilling equipment turned over to the Star Company free of cost.

"Fourth. It is further understood that the Empire Company shall be entitled, out of the gas produced by the Star Company, to the use of gas for the drilling and pumping of the oil wells of the Empire Company in said area, without cost, except for any royalty which may accrue, said gas to be delivered from the wells or pipe lines of the Star Company at points most convenient to the Empire Company, through connections to be installed by the Star Company at the expense of the Empire Company; said gas to be used economically and to be properly metered at the wells or pipe lines of the Star Company, and the meter records to be furnished to the Star Company by the Empire Company.

"Fifth. The Star Company agrees to pay one-half of all rental, renewal, and legal expenses hereafter incurred, in connection with the maintaining of all oil and gas leases covered by this agreement, but such obligation shall cease as to any lease hereafter canceled by the Star Company, from the date of such cancellation. Either party, upon ninety (90) days' notice in writing to the other, may cancel or surrender its interest in or under any lease hereunder, and the party receiving such notice of cancellation or surrender, may, prior to the expiration of said ninety (90) day period, receive upon request an assignment of the entire interest of such other party, and shall thereafter assume all the obligations of such interest acquired.

"Sixth. In case either party encounters, in drilling, the product of the other party, then such party encountering shall immediately cease drilling and notify the other of such fact, and thereupon such other party shall have the right to immediately decide whether it elects to make any tests, and, if it so elects, shall make such tests as it may desire during a period not exceeding thirty (30) days, and shall have the use of tools and equipment used in drilling the well, for the purpose of making such tests. The party making the test shall pay the entire actual cost of the test, and shall have the option, during said thirty (30) day period to take over such well, and, in the event that it elects to take over such well, shall pay to the other party the actual cost of such well.

"It is understood that both parties in all of their drilling operations, hereunder shall protect all productive sands against the infiltration of water in the most approved and workmanlike manner. In the event that either party shall bring in a well producing both gas and oil, then the party other than the driller shall have the right to provide the facilities to separate and recover its product.

"Seventh. The Empire Company reserves for its use such office space and office equipment of the Texas Distributing Company as is now used

in connection with its operation, and agrees to pay for the same one-half of the rent, also one-half of electric light, janitor service, and other incidental expenses, if any, until some other future arrangement is made.

"Eighth. The Empire Company is to furnish to the Star Company a statement of its gas wells, including copy of logs of all wells heretofore drilled in said territory, together with a statement of equipment and a map showing locations of wells, pipe lines, and leases, and also photographic copies of all leases covered by this agreement.

"Ninth. It is understood and agreed that the Empire Company will assign to the Star Company the existing contract between the Empire Company and the Texas Distributing Company for the supply of gas to the Texas Distributing Company.

"Tenth. It is understood that this contract is conditioned upon the cancellation of an existing contract with J. L. Elliott for the property hereby sold, and satisfactory evidence of such cancellation is to be furnished to the Star Company before the signing of this agreement. It is further understood that this agreement is subject to the Empire Company's securing a release of the property hereby sold which may be under any existing mortgage.

"Eleventh. The Empire Company warrants and guarantees its title to all property hereby sold to the Star Company, except that it is understood that all rights and interest conveyed under leases are only such as possessed by the Empire Company.

"In witness whereof the parties hereto have caused these presents to be executed by their appropriate officers, with their respective corporate seals attached.                    Empire Gas & Fuel Company (Maine),
                        "By [Signed] Frank W. Frueauff, Vice President.
"Attest:  [Signed] E. E. McWhiney, Asst. Secretary.  [Corporate Seal.]
                        "Lone Star Gas Company,
                        "By [Signed]  L. B. Denning, President.
"Attest:  [Signed] O. M. Colston, Asst. Secretary.  [Corporate Seal.]"

At the time of entering into this agreement the defendant had under construction and practically completed an 18-inch pipe line from Joshua Junction, a point south of Fort Worth, and to the west of the Mineral Wells field. This pipe line was to be an extension of its system of pipe lines by which it was then transporting and furnishing gas to the cities of Fort Worth, Dallas, and Waco, and various other towns in North Texas. This new pipe line was to be used by it to transport and sell gas from the Mineral Wells field to the mentioned cities and towns.

The building of a pipe line by the plaintiff, the Allied Oil Corporation, and the Texas & Pacific Coal & Oil Company from the Mineral Wells field to Fort Worth would have resulted in instant competition between the defendant and the owners of said pipe line. This competition would have been in the production, transportation, and sale of gas from the Mineral Wells field to Fort Worth. In consideration of the execution of the May 28th agreement, by the defendant, the plaintiff, through its vice president, Mr. Williams, and its lease and land man, Mr. Ford, agreed to withdraw from the association with the Allied Oil Corporation and the Texas & Pacific Coal & Oil Company, and to abandon the building of the pipe line into Fort Worth. This result was the prime inducement and the dominating motive which actuated the officers of the defendant in agreeing to purchase the plaintiff's properties and to the execution of the agreement of May 28th.

The president of the defendant, at the time of the signing of the agreement in New York, reserved the right of an inspection and approval by his attorney at Dallas. Later when the agreement was submitted to the attorney, the attorney refused to approve the agreement, on the ground that the same was in violation of the Texas antitrust statutes, and because the purchase of the stock of the Texas Distributing Company, provided for in the agreement, was ultra vires as to the defendant. There were perhaps other objections, but these were insuperable. The May 28th agreement was never authorized or ratified by the board of directors of either the plaintiff or the defendant.

The defendant had no charter nor statutory power to acquire stock in any Texas corporation other than that of an "oil pipe line corporation" organized in accordance with the Texas statutes. It was actively engaged in the production, transportation, and sale of natural gas as empowered in its charter. The Texas Distributing Company was incorporated, as disclosed by its charter, for the purpose of "storing, transporting, buying, and selling oil and gas, salt, brine, and other mineral solutions, in the state of Texas." Before the making of the May 28th agreement the plaintiff and one Chestnut had differed as to the plaintiff's right to the 916 acres of the land included in the sale to the defendant, and upon which was the Chestnut well. These differences finally ripened into a loss of the possession of these properties by the plaintiff. The value of the Chestnut properties is not definitely fixed by the evidence, but it ranged, under the testimony, as high as $125,000.

What is known in the pleadings as the "Edmondson well" was abandoned by the plaintiffs, the hole filled, and the rig sold, and the same was useless. At the time of the signing of the May 28th agreement the value of that property was thought to be quite large, some fixing it as high as $75,000, if it had resulted in a gas well completed in a workmanlike manner.

In October, 1920, the plaintiff, after it had made the agreement of May 28th, contracted to sell and did sell all of the properties named in its agreement of May 28th to another concern, the Allied Oil Corporation, and has received thereon approximately $80,000. This sale contract provided that the plaintiff would secure an adjournment of the trial of this case, and in the event a decree for specific performance was entered herein, or if the answer of the defendant prayed for a specific performance, and prevented a discontinuance of this suit, that then any consideration received by the plaintiff would be returned to the Allied Company, and the contract would be terminated between it and the plaintiff.

The plaintiff contends that the defendant is compelled to stand by its first choice. It contends that the defendant first refused to go forward with the agreement because it contended that the agreement was violative of the anti-trust statute, and that it may not now be heard to set up other reasons as to why it should not specifically perform. The defendant maintains that the contract was never legally binding; that it was violative of the trust statute; that specific per-

formance may not be required, when the party seeking it cannot deliver.

[1] (a) Articles 7796, 7797, and 7807, Vernon's Sayles' Texas Civil Statutes, volume 4, declare unlawful such combinations and agreements and understandings as prevent or diminish or tend to restrain competition. These provisions read as follows:

Article 7796. *"Trust" Defined.*—"A 'trust' is a combination of capital. skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all of the following purposes:

"1. To create, or which may tend to create, or carry out restrictions in trade or commerce, or · aids to commerce or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this state.

"2. To fix, maintain, increase or reduce the price of merchandise, produce or commodities, or the cost of insurance, or of the preparation of any product for market or transportation.

"3. To prevent or lessen competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or the business of insurance, or to prevent or lessen competition in aids to commerce, or in the preparation of any product for market or transportation.

"4. To fix or maintain any standard or figure whereby the price of any article or commodity of merchandise, produce or commerce, or the cost of transportation, or insurance, or the preparation of any product for market or transportation, shall be ·in any manner affected, controlled or established.

"5. To make, enter into, maintain, execute or carry out any contract, obligation or agreement by which the parties thereto bind, or have bound, themselves not to sell, dispose of, transport or to prepare for market or transportation any article or commodity, or to make any contract of insurance at a price below a common standard or figure, or by which they shall agree in any manner to keep the price of such article or commodity or charge for transportation or insurance, or the cost of the preparation of any product for market or transportation, at a fixed or graded figure, or by which they shall in any manner affect or maintain the price of any commodity or article or the cost of transportation or insurance, or the cost of the preparation of any product for market or transportation between them or themselves and others, to preclude a free and unrestricted competition among themselves or others in the sale or transportation of any such article or commodity, or business or transportation or insurance, or the preparation of any product for market or transportation, or by which they shall agree to pool, combine or unite any interest they may have in connection with the sale or purchase of any article or commodity, or charge for transportation or insurance or charge for the preparation of any product for market or transportation, whereby its price or such charge might be in any manner affected.

"6. To regulate, fix or limit the output of any article or commodity which may be manufactured, mined, produced or sold, or the amount of insurance which may be undertaken, or the amount of work that may be done in the preparation of any product for market or transportation.

"7. To abstain from engaging in or continuing business, or from the purchase or sale of merchandise, produce or commodities partially or entirely within the state of Texas, or any portion thereof."

Article 7797. *" 'Monopoly' Defined.*—A monopoly is a combination or consolidation of two or more corporations when effected in either of the following methods:

"1. When the direction of the affairs of two or more corporations is in any manner brought under the same management or control for the purpose of producing, or where such common management or control tends to create a trust as defined in the first article of this chapter.

"2. Where any corporation acquires the shares or certificates of stock or

bonds, franchise, or other rights, or the physical properties, or any part thereof, of any other corporation or corporations, for the purpose of preventing or lessening, or where the effect of such acquisition tends to affect or lessen competition, whether such acquisition is accomplished directly or through the instrumentality of trustees or otherwise."

Article 7807. "*All Agreements in Violation of, Void.*—Any contract or agreement in violation of the provisions of this chapter shall be absolutely void and not enforceable either in law or equity."

The decisions of the courts of Texas construe liberally these antitrust regulations. If the understanding between the plaintiff and the defendant would result in a diminution of competition, then and in that event the agreement upon which this action is based, and for the performance of which the plaintiff prays, would be illegal and against public policy.

[2, 3] Where the interests of the parties alone are concerned, a court of equity will not decree specific performance of a contract which is illegal, and for that reason void at law. 25 R. C. L. 210; St. Louis v. Mathers, 71 Ill. 592, 22 Am. Rep. 122; Swint v. Carr, 76 Ga. 322, 2 Am. St. Rep. 44.

"An express statutory restriction will not be ignored by the courts, but will be indorsed by the refusal of chancery to decree specific performance of contracts made contrary to the statute."

Where, for instance, a federal statute prohibits a combination amounting to monopoly of trade or commerce among the several states, equity will not enforce performance of a contract to effect such combination. United Shoe Machinery Co. v. La Chapelle, 212 Mass. 467, 99 N. E. 289, Ann. Cas. 1913D, 715. The authorities present, however, a different rule when the public interest is involved, and hold that chancery may enforce an illegal contract as long as such interest requires the enforcement of such a contract. Seattle Electric Co. v. Snoqualmie Falls Power Co., 40 Wash. 380, 82 Pac. 713, 1 L. R. A. (N. S.) 1032. The public is not so concerned in this litigation as to require the court to consider this exception. Therefore the general rule will be followed, and no performance required.

[4, 5] (b) A decree for specific performance is not a matter of right, but rests in the sound discretion of the court. This discretion is not arbitrary nor capricious, but is judicial, and is controlled by the established doctrines and settled principles of equity. 25 R. C. L. 214–216; Alexander v. Hamilton (C. C. A.) 287 Fed. 510. When a chancellor conceives that the basic contract was vicious, meaning by the word "vicious" in contravention of the trust laws of the place of performance, and when it appears that the party seeking performance cannot specifically deliver, then and in that event the relief will be denied. The plaintiff would not be able to deliver the Chestnut lease nor the Edmondson well; these properties were valuable, integral parts of the original agreement.

(c) Because of my view with reference to the two matters above indicated, a discussion of the question of ultra vires and of the question of the legal execution, or approval, of the contract by the plaintiff and defendant corporations, there being no suggestion of ratification of the same, is made unnecessary.

An order will be drawn dismissing the bill.