**DEERING MILLIKEN RESEARCH CORPORATION, Plaintiff,**

Warren A. Seem, Nicholas J. Stoddard, Frederick Tecce and Harold P. Berger, copartners trading as The Permatwist Company, Intervenor,

v.

**LEESONA CORPORATION, Defendant.**

Civ. A. No. 18211.

United States District Court
E. D. New York.
Jan. 9, 1962.

See also 27 F.R.D. 440.

Brumbaugh, Free, Graves & Donohue, New York City, for plaintiff. Granville M. Brumbaugh, James N. Buckner, Richard A. Lochner, New York City, of counsel.

Robert F. Conrad, Watson, Cole, Grindle & Watson, Washington, D. C., for defendant. Debevoise, Plimpton & McLean, New York City, of counsel.

Herman Goldman, New York City, William J. Fuchs and Obermayer, Rebmann, Maxwell and Hippel, Philadelphia, Pa., for The Permatwist Company.

BYERS, District Judge.

Decision here is required concerning the legal effect to be given to a grant-back provision embodied in a written license to Leesona Corporation, defendant, to make and sell certain inventions. Plaintiff was the licensor and defendant the licensee, the date of the contract being November 23, 1954.

The position of the intervenor, The Permatwist Company, will be the subject of separate comment.

The parties will be referred to as the plaintiff, the defendant, and the intervenor, without regard to certain changes in corporate titles which have occurred during the interval between the date of the agreement and the start of this litigation.

The grant-back aspect of the main contract is contained in Paragraph 3 and has to do with the obligation of the defendant to assign to the plaintiff

> "any improvements made on the apparatus or process which is the subject matter of this agreement * * which are acquired by [defendant] or which come under its control during the term of this agreement together with any and all applications for patent and patents granted thereon. * * * "

Other provisions of the paragraph are reserved for later comment.

#### Patents claimed by plaintiff under the foregoing:

(a) U. S. Patent #2,864,229, granted to defendant on December 16, 1958, on application filed June 5, 1957. This is referred to as the 229 patent and is for apparatus generally referred to in this cause as the 511 apparatus.

(b) A pending application for a process patent, Serial No. 653,953, filed April 19, 1957, and any patent that may be granted thereon. Speaking generally, the process is the method of operation of the apparatus described in the 229 patent.

#### The Parties

The plaintiff is a research corporation, organized under the laws of the State of Delaware with its principal place of business in Spartanburg, South Carolina, not engaged in manufacturing; the presently material branch of its activities has to do with thermo-plastic synthetic so-called yarns used in the production of hosiery and fabrics entering into wearing apparel. The plaintiff's income is from royalties paid by its licensees for the use of its inventions.

The defendant is a Massachusetts corporation maintaining a research laboratory in Jamaica, Queens County, in this District, with its principal place of business in Rhode Island. The business of the defendant is the manufacture and sale of machinery and equipment used by mills in the fabrication of hosiery and wearing apparel in which thermo-plastic yarns are used.

The intervenor is a partnership composed of the individuals listed in the title of this cause. It may be thought of generally (in 1954) as a rival of the plaintiff in the design and licensing of mechanical equipment and the attendant processes of operation in the same field of endeavor.

#### Jurisdiction

The jurisdiction of this court which is uncontested, is based on 28 U.S.C. § 1332; venue attaches by virtue of 28 U.S.C. § 1391(c).

#### The subject-matter

Discussion of the decisions upon which plaintiff relies would not be appropriate until an understanding be established

of the subject-matter of the above license agreement and the patents.

Thermo-plastic yarns are formed from a chemical described as a polyamide; as delivered by the producer they can be worked into many products not presently germane, as well as to the so-called nylon yarn here involved. The adaptation of such synthetic yarn to the requirements of hosiery and fabric manufacturers enlisted the skills of these several parties to the solution of problems which lay in the path of that objective.

The evidence is thought to establish that the raw nylon as delivered by the producer is almost an inert thing. A given filament resembles in appearance a fine string or cord, gray in color and limp rather than rigid. It possesses certain latent possibilities which can be aroused into manifestation by physical means such as the application of heat up to 400° F., dry or wet stretching to soften the filament, and surface pressure to create inner tension.

These measures when properly applied are said to cause a molecular realignment within the filament as a result of which certain latent or potential properties which were dormant in the raw nylon are thus actuated to such an extent that the yarn may ultimately come to assume the crinkly appearance of one composed of the natural fibres of wool or cotton.

Since these manifestations are the result of phenomena occurring within the yarn and hence are invisible, the causes themselves and the precise reactions, are hidden from view; the effects or manifestations, however, are clearly observable and are subject to control. This means that the following theoretical explanations of what probably takes place within the yarn should be tolerated for present purposes, as reflecting this Court's understanding of the relevant testimony.

It is uncontradicted that the changes brought about in the molecular pattern are entirely physical and the chemical formula of the raw nylon is not changed as the result of these several treatments.

The introduction of acetic acid into one of the finishing operations is not stated to have changed the chemical constituency of the yarn as originally delivered.

### The Twist

The adaptability of nylon yarn to the purposes above referred to, requires the formation in the yarn of what is known as the twist, (also called a crimp) which is a spiral that so functions as to impart the necessary characteristics to the yarn and is thus essential to the desired result; that is to say, the transformation is from the straight rod-like characteristic of the nylon filament into that which causes it to resemble natural yarn.

So much was broadly understood in 1954 at about the time when this agreement was entered into. The generally recognized method for the accomplishment of that purpose involved twisting heated yarn, namely, the fabrication of a torque twist yarn, which became such as the result of its being rotated by mechanical action and then heat treated, after which it cooled and set itself. As the defendant's witness, Dudzik, put it:

"* * * when it goes through the false twist spindle, this temporary twist which was inserted in the heater is removed, and since the yarn is perfectly stable below the spindle, reverse torque forces are set up in the yarn strand, which caused each of the individual filaments to kink * * *."

The plaintiff conceived of a different method to actuate the needed twist, that is, the yarn being under tension, is passed over a heated surface and then bent over a knife blade at an angle, and thence over guides to a feed roll. The pressure exerted on the yarn as it passes over the blade, causes a compression at the point of contact, and creates a tension at the opposite point, and thus the twist is formed in what thereafter is called Agilon yarn.

The importance of these different methods for bringing the twist into existence lies in the fact that the defendant had designed apparatus and processes to

make use of the false twist or torque yarns in the production of Fluflon and Superloft yarns, so-called, which were known to the industry at the time when the plaintiff was perfecting and arranging to license its Agilon yarn equipment and processes.

Thus the false twist and the crimpedge elasticized yarns were destined to compete for the market provided by the mills that manufactured hosiery and fabrics. It should be added that the twist according to either process is entirely visible to the naked eye. It causes a filament of yarn to assume the appearance of a helical or coiled spring, and as the ends are pulled apart—stretched—the coils are separated by ever widening uniform spaces, but do not disappear.

Once this twist has manifested itself, the remaining treatment and processes are designed to preserve its presence, and to somewhat control, modify, rectify, or discipline its energies.

Whether the respective physical properties so manifested do indeed differ in essence, cannot be dogmatically asserted; witnesses for both parties stated the belief that there is a difference but whether, if present, it was actually perceived in 1954 by those who were best informed on the subject, cannot be asserted with assurance.

Since the Fluflon and Superloft yarns were lineal descendants, so to speak, of that which was produced by the earlier Hellenca process of Swiss origin, they antedated Agilon yarn, and the preoccupation of the defendant was with the development of such torque twist yarns on their 550 machine. That development however did not result in the creation of a *bulk* yarn although the product was capable of being used in the manufacture of women's hosiery with results that were not satisfactory in the finished article of wear.

This means that when the license agreement was entered into, the plaintiff was aware of all that had taken place in the development of the torque twist yarns, and arranged with the defendant for the manufacture by it of the Agilon apparatus, with the understanding that the defendant might be induced to perfect and sell the Agilon apparatus despite the achievements of its own 550 machine which treated torque twist yarns.

That in general was the situation that confronted the parties when they entered into the agreement which is the subject-matter of this litigation.

This introduces the terms "elasticized" and "stretch" yarns. The distinction is not too clear, as was conceded on final argument by plaintiff's counsel. It is here thought that the term "stretch" characterizes the yarn after it is woven into a fabric into which elasticized yarn has entered, whereby permanent configuration of the ultimate manufactured product is assured, despite the original elasticized character of the yarn.

It is impossible to say at what precise period of time the defendant became aware that the torque twist yarn produced on its 550 machine could be subjected to a further or supplemental treatment necessary to develop the properties comprehended in the term "bulk yarn." This means that the exact date cannot be stated with reference to the contract of November 23, 1954 but in all probability it was subsequent thereto by some months.

In this connection, plaintiff's Exhibit 44 has not been overlooked. It is a defendant's office memorandum (of November 15, 1954) concerning the deliberations of a conference of certain members of the defendant's staff, held on November 12, 1954, and contains the following:

"C. *Agilon machine.* Consideration will be given to combining the Agilon function with either the Superloft (No. 550) or the Taslan (No. 991) machine. Possibly a combination of all three functions on one frame will be feasible. Sales will further study the desires of the customers in this respect. * * *"

The foregoing of course does not disclose whether such consideration was actually brought to bear, nor the out-

come thereof; at most it would be consistent with a realization at the date stated, that carrying forward the development of Agilon yarns might somewhat coincide with that of the torque twist yarns.

Also, it is impossible to state that there was present in the mind of the plaintiff at that date an awareness that if such subsequent and additional step were to be taken in connection with torque twist yarns, the same step could also be perfected in the same way in connection with Agilon yarns. This aspect of the situation as it existed when the contract was written, as this Court understands the testimony, is thought to be suggestive concerning the probable attitude of mind of the parties as they negotiated this license agreement.

In other words, if the plaintiff had said in substance or effect in addressing the defendant, "We shall claim from you (under Paragraph 3) whatever you may invent or develop of apparatus or processes involving *either* torque twist or Agilon crimp-edge twist, to accomplish a change of elasticized yarns into something else," the defendant would have been apprized of the plaintiff's position as at present asserted, and could have agreed or refused so to contract.

Since the document in suit was the outcome of carefully considered negotiation, it seems that at the time in question neither party realized the likelihood of what subsequently took place; that it was a more or less fortuitous and later discovery that both types of yarn could be so treated on what is now known as the 511 apparatus, as to produce bulk yarns. If the foregoing is correctly reasoned, it follows that the Court is now called upon to endeavor to supply an answer to a possible suggestion which the plaintiff failed to propound during the process of negotiation.

It should be said in this connection, that the 229 patent covering the 511 apparatus portrays in clear terms that its teaching has to do with torque twist yarns, and licenses issued thereunder are so restricted.

### Bulk yarn results from the functioning of the 511 apparatus

Here it is necessary to distinguish *what* from *how*.

It is common ground that the end product of the 511 apparatus is bulk yarn, something which could not be produced by either the Agilon apparatus or the defendant's 550 machine. The opening remarks of the plaintiff's counsel put the matter so plainly that they are now quoted:

"I might say that a bulk yarn is a yarn, the fibres of which occupy a considerable amount of space; for example, if people were standing closely together and suddenly raised their elbows, they would require more space to stand in. Well, a bulk yarn has elbows or protuberances in its fibres that cause them to open up and to spread and to make the yarn without being any heavier, to make it occupy more space and such a yarn is useful in garments, such as sweaters and the like."

There is nothing in the testimony which contradicts the foregoing.

Thus the testimony demonstrates that the yarn which emerges from the 511 apparatus and process is a thing which did not exist as the product of either the plaintiff's Agilon apparatus and process, or the defendant's 550 machine and process.

This is a finding.

All witnesses agree that the 511 apparatus and process do not accomplish the same thing that the Agilon process and apparatus bring into existence, namely they do not *impart* a twist to the yarn undergoing its treatment. The word "impart" is commonly employed by the witnesses on both sides although it is not entirely precise in the sense that something passes from either mechanism to the yarn being treated, but it is sufficiently accurate to justify its use.

If that be true, the 511 apparatus starts where the Agilon machine finishes, which is another way of saying that since the bulk yarn becomes such as the

result of treatment in the 511 machine and process, what emerges is an improvement in the yarn, not an improvement on the Agilon machine or process.

The word "improvement" is intended to mean that which renders the yarn more broadly adaptable for ultimate use.

A word should be said by way of explanation of the way that the two mechanisms perform. Plaintiff's Exhibit 2 is a schematic drawing of the Agilon apparatus which shows the passage of the yarn as received from the producer thereof, through a guide and tension device, whence it is drawn over a heater strip and while in the heated state it is bent around a sharp edge and immediately cools and then passes through a pulley and guide and rolls to the spindle where it becomes an article of commerce.

The above word "tension" the Court understands to mean a property of yielding or resilient resistance to linear distention, which provides an element of stability to the yarn. That definition may not be acceptable to the parties but will serve present purposes, with the understanding that tension is actuated by exterior pressure at fig. 3 of Exhibit 2 called "Tension Gate."

The way in which the 511 apparatus and process function is shown on Plaintiff's Exhibit 54. Two strands of yarn (having now developed either the Agilon crimp-edge twist or the torque or false twist) emerge from supply packages and together pass through tension discs where they proceed in unison to a capstan "around which the yarn is threaded." It is then guided into surface contact with a heater and thence to another capstan from which it passes through a guide and on to a spindle.

As to the latter, reference will hereafter be made to a cone adapter, which is not material to the present explanation.

Thus the yarn receives in the 511 apparatus a subsequent treatment, which causes it to become bulk yarn. That is a secondary training or discipline which would be consistent with the actuation within the yarn of a further molecular realignment causing the *bulk* yarn to come into existence for the first time.

This attempt to explain the "how" cannot be fortified by a reference to testimony; it is merely an observation by the Court based upon a study of the record as a whole; it is not asserted as a fact.

If the 511 apparatus involved a better or different blade or a substitute for a blade, or a better heater (infra-red, for instance), or an improved method of arousing or controlling tension while the yarn was receiving the crimp edge twist, such would constitute an improvement upon the apparatus or process which caused the twist to form. However, they would not accomplish an alteration in the character of the yarn itself, necessary to cause the creation of bulk yarn.

### The License Agreement

Plaintiff's Exhibit 1 is the agreement in suit and should be consulted for exactness. The presently material provisions recite that the plaintff owns certain technical inventions and technical information "relating to elasticized yarn and the apparatus and process employed in the manufacture of such yarn, which process and apparatus comprise passing yarn under predetermined tension about a sharp edge and equipment therefor."

Thus the crimp edge method of inducing the twist is stated. That is followed by a provision for a royalty free license to manufacture and sell the said apparatus. Paragraph 3 is sufficiently important to requote in part:

"Any improvements made on the apparatus or process which is the subject matter of this agreement by or through the efforts of [defendant's] employees or which are acquired by [defendant] or which come under its control during the term of this agreement together with any and all applications for patent and patents granted thereon shall become the property of [plaintiff] and [defendant] hereby agrees to assign or to cause the same to be assigned to [plaintiff] to the full extent of the interest therein

by [defendant] and the same shall be available to [defendant] exclusively for manufacture and sale to [plaintiff's] licensees also without payment of royalty. In the event this agreement is terminated as hereinafter provided, [defendant] shall have the exclusive right to manufacture for sale any improvements assigned to [plaintiff] as herein provided, excepting the manufacture for sale of such improvements for use in the practice of the elasticizing yarn process and/or apparatus defined herein."

Comment has been heretofore made concerning the term "elasticized" yarns as distinguished from "stretch" yarns.

The use of the word "comprise" in the introductory paragraph now is to be quoted and will be later discussed:

"Whereas [plaintiff] is the owner of the entire right, title and interest in and to certain inventions and technical information relating to elasticized yarn and the apparatus and process employed in the manufacture of such yarn, which process and apparatus *comprise* passing yarn under predetermined tension about a sharp edge and equipment therefor and which inventions are described and claimed in application for United States letter Patent hereinafter referred to per Appendix 'A' * * *." (Ital. supplied)

### Plaintiff's Contentions

(a) An improvement in the *yarn* is contemplated by the terms of the grant-back clause. This invites the comment that if such was indeed in the minds of the parties, it would have been a simple thing so to say in the grant-back clause.

Sight has not been lost that the witness Armitage is quoted as stating to the defendant's president before the contract in suit was signed, that what plaintiff was looking for was a yarn that was "usable." That testimony came in connection with the substitution of the word "comprises" for "consists of" and read in context, it must be understood to re-

fer to the means whereby the crimp edge twist was actuated in elasticized yarns, not the possible creation of a yarn not thereby brought into existence.

It has been recognized that the word "comprise" is of broader significance than the words "consists of" because the former is thought to include rather than exclude possible variants in the elements of a given patentable disclosure. See In re Hunter, Cust. & Pat.App., 288 F.2d 930, 129 U.S.P.Q. 225, 226; In re Cone, 121 F.2d 470, 28 C.C.P.A. 1282. In neither case was the quoted expression deemed adequate to save the patent claims under examination.

The present interpretation of the word "comprise" is that it does not extend the Agilon apparatus and process so as to include the 511 apparatus and process because the latter bring into existence a yarn which was not a result of the functioning of the former.

If this Court could agree, which it cannot, with the assertion that an improvement in the yarn comes within the fair interpretation of the grant-back clause, it would still be necessary to consider whether, strictly speaking, bulk yarn is an improvement on the crimp edge Agilon yarn.

In one sense the argument is plausible that the 511 apparatus and process so affect that which emerges from the spindle 11 (Plaintiff's Exhibit 2) as to result in yielding a better or improved commodity than it received. This is not to say however that the crimp edge twist if it is present in bulk yarns, is an *improved* crimp edge twist as it was developed in the Agilon apparatus and process. It is rather a twist of different properties and in its later manifestation it is perhaps an elasticized yarn but it is also a yarn of different and added physical properties, whereby it is now capable of employment not previously available to it.

Thus the word "improvement" is inadequate to denote the change or alteration in the Agilon yarn once it has submitted itself to the 511 apparatus and process.

As this Court understands the evidence, bulk yarn is probably an elasticized yarn which has undergone a secondary treatment or education which has created something which did not previously exist—not merely a different kind of crimp edge yarn which, however highly perfected as such, could never have been graduated into the category of bulk yarn.

Stated differently, the plaintiff seems to argue that bulk yarn can be directly traced to the crimp edge twist of Agilon yarn through the functioning of the 511 apparatus; the twist originally imparted is developed into what is concededly the effective cause of bringing bulk yarn into existence, therefore that development is an improvement on the Agilon apparatus and hence becomes plaintiff's property by operation of the grant-back clause.

If so much were granted arguendo, it would be calculated to avoid the failure of the agreement to refer in terms to improvement in the yarn.

In this connection, the defendant cites (Exhibit N) the license agreement between the plaintiff and the Duplan Corporation dated *July 12, 1954* to manufacture and sell Agilon yarn in which the following occurs:

"improvements made on the elasticized yarn, the process by which such yarn is manufactured and/or the apparatus employed in such manufacture which are the subject of this agreement * * *."

The foregoing follows a recital concerning the subject-matter of the agreement as

"certain inventions and technical information relating to elasticized yarn and the process of manufacturing such yarn, which inventions are described and claimed in applications * * * Appendix 'A' * *."

A later agreement between the same parties refers to

"any improvements made on or anything useful in connection with the textured yarn,"

and the subject-matter was defined as

"certain inventions and technical information relating to textured yarns comprising stretch and bulk edge-crimped elasticized yarn and the process of and equipment for manufacturing such yarn, * * *."

The foregoing indicate that when the plaintiff intended to embody in a license agreement the subject of improvement in the yarn as distinguished from an improvement in the mechanism employed to create such yarn, the intention was clearly embodied in appropriate phraseology; ergo the absence of such expressions in the grant-back clause of November 23, 1954 must be seen to reflect a deliberate choice of coverage in the formulation of the instant contract.

The plaintiff fails to recognize that by the *development* of the Agilon twist or crimp, it could have become a superlative crimp edge twist, without thereby enabling its host to become a bulk yarn.

The distinction may be criticized as narrow, but in my opinion it is valid and of sufficient substance to require recognition.

As to the word "comprise" as employed in this agreement, it is descriptive of the means employed to produce the crimp edge twist and contemplates a wider range of elements designed to produce that result, but not a mechanism or process calculated to bring into existence a different product.

(b) The 511 apparatus and process provide an alternative method of finishing the Agilon yarn which is a necessary step in rendering the yarn adaptable for final use.

This argument involves some understanding of what was comprehended in 1954 of what was called "finishing" the yarn. Generally speaking, the finishing involved water treatment, hot or cold, and a change in the temperature of the water as a necessary step in developing or fixing the characteristics of the twist in order to render the yarn adaptable for employment in fabric of one kind or another. A great deal of testimony was

offered on this subject, which seems not to require recapitulation. The various steps are shown in Defendant's Exhibit A, being a blackboard chart in which step number 4 is of great importance. That involves the immersion of a garment in water, some agitation, and varying degrees of temperature of the water.

It was the impression of the Court that it was the finishing of the yarn which was thought by the plaintiff to be the basis of its assertion of the right to acquire the 511 apparatus and process. Plaintiff's counsel answered a question propounded by the Court in this wise:

"We assert that the step of developing the crimp is an essential part of the Agilon process, and that anything that accomplished that result is embraced within the terms of the grant-back clause of paragraph three."

And again,

"Our position is not only that the 511 device may be used to accomplish the development step in the finishing operation, but our position also is that wherever the 511 device is used, if it accomplished an improvement in the yarn, we are entitled to it also.

"I don't want to leave the impression that our position is solely that the 511 device is just a device for accomplishing a part of the finishing operation that Mr. Conrad portrayed in his original block 4.

"Our position is that if it accomplishes an improvement in the yarn, wherever it is used in the Agilon process, from start to finish, then we are entitled to it under the grant-back clause."

It is the understanding of the Court that the emergence of the crimp edge yarn into a bulk yarn cannot be accurately defined as a finishing process. When the Agilon yarn was wound on the spindle (#11, Exhibit 2) it was an article of commerce. Both sides so agree.

When it was woven into fabric, its adaptability was completed by the finishing process above referred to, and it was essentially a crimp edge yarn rendered into a stretch yarn after its incorporation into fabric.

The 511 apparatus and process does not accomplish the finishing of Agilon yarn. It brings into existence a bulk yarn which the Agilon mechanism could not accomplish. To call the functioning of the 511 apparatus and process a finishing of the Agilon yarn seems to this Court to be a misnomer, since the Agilon yarn could be finished and refinished indefinitely without bringing into existence a bulk yarn.

(c) The parties have construed the grant-back provisions, according to plaintiff's theories, by their conduct in reference to the cone adapter device now to be briefly described.

It appears that experience demonstrated that when the Agilon yarn was rewound from the spindle (#11, Exhibit 2) to a cone from which it was unwound for manufacturing purposes, twist variations appeared as a result; therefore a cone was substituted for the spindle to eliminate this intermediate development, and the plaintiff secured a patent on the cone adapter. That was the subject of a later agreement between the plaintiff and the defendant concerning which the following was written by the former:

"You have heretofore been given a license under our patent rights by agreement dated November 23, 1954, to make and sell such cone adapter sets for use only with spindles coacting with the change-over equipment installed by our process licensees for the production of elasticized yarn under our patent rights."

Thus it is seen the plaintiff imparted to the defendant an improvement on the Agilon apparatus and process which the defendant accepted, and the argument is that a course of conduct was thus established which fortifies the plaintiff's present position.

The use of the cone adapter in no wise altered, modified or otherwise affected the crimp edge twist Agilon, and the con-

duct of the parties in dealing with that incident was consistent with the recognition by the plaintiff of its duties toward the defendant, without demonstrating an obligation on the part of the defendant arising under the grant-back, having to do with the transformation of the Agilon elasticized yarn into a bulk yarn.

(d) The intention of the parties to envisage the inclusion of such a device as the 511 apparatus within the scope of the grant-back clause should be spelled out from part of the language heretofore quoted, namely:

"In the event this agreement is terminated as hereinafter provided, [defendant] shall have the exclusive right to manufacture for sale any improvements assigned to [plaintiff] as herein provided, excepting the manufacture for sale of such improvements for use in the practice of the elasticizing yarn process and/or apparatus defined herein."

It should be stated that the agreement in suit has not been terminated so that the above quoted provision has not been called into operation.

If the plaintiff's argument is understood, it is that if termination should take place, the defendant should have the exclusive right to manufacture for sale the said 511 apparatus—after it has been assigned to the plaintiff as herein sought —excepting the manufacture for sale of such improvements for use in the practice of the Agilon process and/or apparatus.

In light of the failure of the entire contract to contain express language which would vindicate the plaintiff's claim under the grant-back clause which it has been the object to discuss above, it is my opinion that this argument adds nothing to the contentions heretofore examined and found to be wanting.

The foregoing discussion is intended to disclose the Court's understanding of the subject-matter of this litigation.

It should be added that what is said concerning that which takes place in the operation of the 511 apparatus and process is gained in part from the plaintiff's discussion concerning its own 2110 apparatus as well as from the testimony of the defendant's various witnesses.

The 2110 Agilon apparatus is understood to be made up of both the original Agilon apparatus and an adaptation of the defendant's 511 apparatus, whereby bulk yarn is produced. It is covered by U. S. Letters Patent #2,977,746, granted April 4, 1961. This means that the plaintiff has a complete understanding concerning the 511 apparatus and process.

It is possible that issues touching patentable invention may arise in connection therewith, and it is not the intention of this Court, in deciding the present controversy, to write anything which could be thought to affect such strictly patent matters as validity or infringement.

### Certain Prior Decisions

That a grant-back provision in a patent license agreement is not *per se* illegal and unenforceable, was stated in Transparent-Wrap etc. v. Stokes etc., 329 U.S. 637 at 648, 67 S.Ct. 610, 91 L.Ed. 563.

That general proposition is not disputed by this defendant. The application of the principle manifestly depends upon the circumstances under which it is invoked.

American Cone etc. v. Consolidated etc., 2 Cir., 247 F. 335:

A district court decision was affirmed by the then 2nd C.C.A. which held that a second patent did not come within a similar contract; both inventions had to do with machines to mold and bake ice cream cones. A quotation from this opinion may be permitted (p. 336 of 247 F.):

"We think it clear that the purpose of the language used was not to subject every future cone baker which Groset might devise to the assignment; the improvements covered by the phrase were those to that machine, not to the art in general. Every more efficient machine would be an improvement 'upon' it, in common speech, but not 'to' it. * * * It is, of course, true that any improved cone baker might supersede

that purchased by the plaintiff's predecessors, and would therefore defeat the grant. Perhaps it would have been legal to bind Groset to assign any future machine against such a possibility; we need not pass upon that question. All we say is that, if the purpose is so broad, the language must not be so vague. Groset was free to make a new cone baker, which might successfully compete with the plaintiff, so long as it was not an improvement 'to' the disclosure of his first patent.

"It must be confessed that there is still great latitude open; we agree with the plaintiff that an 'improvement' need not necessarily be a physical addition to the machine, leaving all its parts unchanged. Now, it is true that it might be hard, once some reorganization is admitted as possible within the word 'improvement,' to draw a satisfactory definition dialectically between one improvement and another. But we are concerned with affairs, not logic, and we look to their circumstances to understand what the parties meant."

Here we are not dealing with the 511 apparatus as competitive with the Agilon apparatus, but with one that treats a completed product of the latter and changes it into a different thing.

West Disinfecting Co. v. United States Paper Mills, D.C., 44 F.2d 803:

The court had to decide such a controversy as this, where the second patent showed a device which could take the place of an earlier one. That was the invention by an employee of plaintiff, of an attachment to a paper folding machine. As to it, the court says (p. 804 of 44 F.2d):

"This later device enabled the original machine to greatly increase the output it was able to make by Winter's first device."

Based upon this analysis, the court held the denial of relief to the plaintiff to be in error, in view of the contractual provision relating to "all improvements thereon [the first attachment] or variations thereof" and "of any improvements he (Winter) may invent or discover upon or affecting said folding machine."

Since the operation of the new device merely increased the output of the folding machine, no resemblance to the functioning of the 511 machine here involved is brought to light. The decision therefore lacks application to this controversy.

Universal Sales etc. v. California Press etc., 20 Cal.2d 751, 128 P.2d 665:

This does not involve the interpretation of a grant-back provision of a patent license agreement, but the effect to be given to a contract of joint adventure. The parties were the makers of a pellet machine, and the purchaser thereof; the buyer interested the seller in producing a more efficient machine; the latter did this by inventing a more efficient machine but of a different type.

The product of the new machine was the same kind of pellet which was produced by more efficient mechanism.

This action was for a declaratory judgment, and the new machine was held to be comprehended in the intent of the parties as expressed in the contract which created the venture.

No new or different product being involved, the case is inapposite to this controversy.

The result of the foregoing is that in the opinion of this Court, the plaintiff has failed to demonstrate its right to acquire from the defendant the 511 apparatus and the process attending same.

The *Findings* therefore are:

1. The defendant's 511 apparatus and process so function when the Agilon crimp edge yarn is subjected to them that a bulk yarn is brought into existence.

2. The said bulk yarn could not be produced through the operation of the Agilon apparatus and process.

3. The 511 apparatus is not an improvement upon the Agilon apparatus within the contemplation of the grant-

back clause contained in the license agreement between the plaintiff and defendant, bearing date November 23, 1954.

## Conclusion

Judgment must be rendered for the defendant on the merits, with costs, denying to the plaintiff any rights under U. S. Patent #2,864,229 and the pending application for a process patent No. 653,953.

## The Intervenor's Case

It is probably unnecessary, in view of the foregoing, to do more than allude briefly to intervenor's case.

The status of the latter is based on the invention of that which resulted in the 511 patent, which is now the property of the defendant. The precise parentage of that invention is of relative unimportance, although much of the trial record is addressed to the subject.

The basis of the intervenor's cause is an agreement between the said partnership and the defendant bearing date December 14, 1954 or 21 days later than that between defendant and plaintiff. That contract covered other inventions in addition to the 511 attachment now shown in the 229 patent, and application #653,953. All were assigned to the defendant. The contract contained this clause:

"That Universal [the then name of this defendant] shall not assign this Agreement without the consent of Permatwist [the said partnership] except to a successor or purchaser of its going business who shall assume all of its obligations hereunder."

By reason of the foregoing, intervenor argues:

A. Defendant cannot convey to plaintiff the said 229 patent and the pending attendant process application.

This seems to mean that by a later contract with plaintiff, the defendant disabled itself from performing its grant-back obligation already entered into.

B. That in the alternative, if it be decided that defendant must be held to the performance of plaintiff's theory of the grant-back obligation, plaintiff must be held to take over all the duties assumed by defendant in the contract of December 14, 1954, including participation in royalties, etc.

It must be obvious why I believe that these questions are not now reached.

In the event that a reviewing court shall hold that the decision here made is clearly erroneous, and that the relief sought by plaintiff must be granted, it would then follow that a final decree in this controversy would necessarily deal with the intervenor's cause as pleaded, and that the above contentions might well require the taking of further testimony in order to secure embracive and definitive adjudication.

The record thus far is not clear and convincing as to the measure of understanding possessed by Permatwist of the then recently concluded contract between plaintiff and defendant. That would seem to be an important subject for illumination in the effort to formulate the measure of equitable relief to be granted to the prevailing party.

Again, the extent to which defendant should be held to have received only a qualified or limited title to the 229 patent and the process application, would have to receive more careful consideration than is presently deemed to be appropriate. And finally, whether intervenor's real controversy should be confined to its cause for an alleged breach of contract with the defendant, assuming, if plaintiff should succeed, a transfer of ownership in the 229 patent and the attendant process pursuant to the decree of a court of equity, would constitute such a cause.

Probably there are other matters similarly involved, for the exploration of which the settlement of a final decree would invite appropriate consideration.

In directing judgment for the defendant as against the plaintiff, this Court does not deem the occasion ripe to resolve issues that conceivably may not survive an appeal. Manifestly, the intervenor's cause is not now disposed of, but as to it the Court retains jurisdiction, for such consideration and disposition as may be

788

requisite in view of future developments in this litigation.

This Court is indebted to all counsel for helpful and instructive advocacy, oral and written.

If further findings or conclusions are desired, they may be settled on notice.

Settle decree in accord with the foregoing.